1  Rosemary M. Rivas (State Bar No. 209147)
   Email: rrivas@zlk.com
2  **LEVI & KORSINSKY, LLP**
   44 Montgomery Street, Suite 650
3  San Francisco, California 94104
   Telephone: (415) 291-2420
4  Facsimile: (415) 484-1294

5  Lead Counsel for Plaintiff and the Class

6  [Additional Counsel listed on signature block.]

7

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN JOSE DIVISION**

11  IN RE RESTORATION ROBOTICS, INC.      | Case No. 5:18-cv-03712-EJD
    SECURITIES LITIGATION.
12                                        | Hon. Edward J. Davila

13                                        | **CLASS ACTION**

14
                                          | **CONSOLIDATED AMENDED**
15                                        | **COMPLAINT FOR VIOLATIONS OF THE**
                                          | **FEDERAL SECURITIES LAWS**
16
                                          | **DEMAND FOR JURY TRIAL**
17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

# TABLE OF CONTENTS

SUMMARY OF THE ACTION .................................................................1

JURISDICTION AND VENUE ...............................................................4

PARTIES ................................................................................................4

    A.    Plaintiff ..............................................................................4

    B.    Restoration Robotics .........................................................4

    C.    The Individual Defendants .................................................5

    D.    The Venture Capital Defendants .......................................6

    E.    The Underwriter Defendants ..............................................7

RELEVANT BACKGROUND .................................................................9

    A.    Confidential Witnesses .....................................................9

    B.    Company Overview .........................................................10

    C.    The Company Operates on the Razor/Razor Blade Model to Secure Recurring Revenue from Physician Clients .......................................11

    D.    Overview of the Company's Sales Force and Growth Strategy .......................13

        1.    In the Offering Materials, the Company Claimed it Had a Sales Force Uniquely Capable of Selling the ARTAS System Domestically and a Distributor System to Drive Sales Abroad ..............................................13

        2.    The Company's Purported Growth Strategy .............................................15

UNDISCLOSED MATERIALLY ADVERSE CONDITIONS AND TRENDS THAT EXISTED PRIOR TO AND AT THE TIME OF THE IPO ...........................................15

    A.    The Company's Failure to Provide its Customers with Promised High Quality Patient Leads and Undisclosed Additional Costs Cause Restoration Robotics to Lose Significant Business and Revenue as Physicians Abandon ARTAS .........15

    B.    The ARTAS System is Riddled with Product Issues That Cause Doctors to Demand Refunds or Abandon the Product Altogether ......................................20

    C.    Restoration Robotics' ARTAS System Is Cost-Prohibitive for Doctors Due to High Up Front Cost and Undisclosed Additional Procedure Costs ...................21

    D.    Forthcoming Changes to the ARTAS System Stall Sales While Doctors Await the New Product ........................................................23

    E.    Increased Warehousing by International Distributors Leads to Temporary Bumps in System Sales, but No Recurring Procedure Revenue, as ARTAS Systems Are Allowed to Lie Fallow ................................................24

THE COMPANY GOES PUBLIC BY MEANS OF THE MATERIALLY FALSE AND MISLEADING OFFERING MATERIALS ................................................................25

    A.    The Offering Materials' Materially False, Misleading and Incomplete Statements Concerning Restoration Robotics' Marketing Function .................26

    B.    The Offering Materials' Materially False, Misleading, and Incomplete Statements Concerning the Quality and Design of the ARTAS System ...........28

    C.    The Offering Materials' Materially False, Misleading, and Incomplete Statements Concerning the Number of ARTAS Systems Installed and their Prospects for Revenue Generation.......................................................................29

POST-IPO EVENTS CAUSE RESTORATION ROBOTICS' STOCK PRICE TO PLUMMET AS THE ADVERSE CONDITIONS KNOWN PRIOR TO THE IPO COME TO A HEAD AND NEGATIVELY IMPACT THE COMPANY'S FINANCIAL PERFORMANCE .........................................................................................................32

    A.    System Revenues Continue to Plummet as Dissatisfied Doctors Abandon ARTAS ...............................................................................................................32

    B.    Despite Claiming to be Focused on a European Expansion in the Prospectus, the Company Shifts to a "U.S.-Centric" Model Because of an Over-Supply of ARTAS Systems Among its Foreign Distributors...............................................33

    C.    The Company is Forced to Make a Major Investment in its U.S. Sales Force in an Attempt to Curb Falling Revenues.................................................................34

    D.    The Company Admits that Physicians Are Refraining From ARTAS Purchases While Awaiting the Arrival of the Implantation Function..................................36

DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT........................................37

    A.    Disclosure Obligations under the Securities Act and Regulation S-K ...............37

    B.    Defendants Violated Their Disclosure Obligations in the Registration Statement39

INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..............................................40

CLASS ACTION ALLEGATIONS ..........................................................................................40

FIRST CAUSE OF ACTION ....................................................................................................41

SECOND CAUSE OF ACTION ...............................................................................................43

PRAYER FOR RELIEF ............................................................................................................44

JURY DEMAND.......................................................................................................................44

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Court-appointed Lead Plaintiff Edgardo Guerrini ("Plaintiff"), by and through the undersigned counsel, brings this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") individually and on behalf of all persons or entities other than defendants who purchased common stock issued by Restoration Robotics, Inc. ("Restoration Robotics" or the "Company") pursuant to or traceable to the Company's Initial Public Offering (the "IPO" or "Offering") that commenced on October 12, 2017 and closed on October 16, 2017.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on the investigation of his undersigned Counsel, which included, among other things, review and analysis of: (i) Restoration Robotics' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Restoration Robotics' other public statements, including press releases and investor calls; (iii) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Restoration Robotics and the industry in which it operates; and (iv) interviews with confidential witnesses ("CWs"), including former Restoration Robotics employees, as further described below.[1]  Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     For all claims stated herein, Plaintiff expressly disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

2.     This securities class action is brought under Sections 11 and 15 of the Securities Act against: (i) Restoration Robotics; (ii) certain members of Restoration Robotics' senior management and its board of directors (the "Board") that signed the Registration Statement (as defined herein) in connection with the Company's IPO; (iii) the Venture Capital Defendants (as defined herein); and (iv) each of the investment banks that participated in the Offering as an underwriter (the "Underwriter

---

[1] Plaintiff refers to the CWs herein using feminine pronouns, without regard to the CW's gender.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants" and, together with Restoration Robotics, the Individual Defendants (as defined herein), and the Venture Capital Defendants, "Defendants")).

3.    Plaintiff alleges that the Registration Statement (as defined herein) (and Prospectus (as defined herein) incorporated therein)[2] contained materially untrue statements of material fact and/or omitted to state material facts required to make the statements in the Registration Statement not misleading.

4.    Founded in 2002, defendant Restoration Robotics is a medical technology company developing and commercializing a robotic device (the "ARTAS System") that assists physicians in performing many of the repetitive tasks that are a part of a follicular unit extraction ("FUE") surgery, a type of hair restoration procedure.

5.    On or about September 1, 2017, the Company announced that it had filed a registration statement on Form S-1 with the SEC relating to a proposed initial public offering of shares of its common stock.

6.    The September 1, 2017 Form S-1 Registration Statement was followed by several amendments, the last of which was filed with the SEC on October 6, 2017 (Registration No. 333-220303), which became effective on October 11, 2017 (as amended, the "Registration Statement").

7.    On October 13, 2017, Restoration Robotics filed with the SEC a Prospectus pursuant to Rule 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Materials"), commencing the public offering of 3,575,000 shares of Restoration Robotics shares of common stock priced at $7.00 per share, with an underwriter over-allotment option to purchase up to an additional 536,250 shares.

8.    In violation of the Securities Act, Defendants negligently issued untrue statements of material facts in, and omitted to state material facts required to be stated from, the Offering Materials filed by the Company with the SEC and presented to the investing public in support of the IPO.

9.    In their capacities as signers of the Registration Statement and/or as an issuer, statutory

---

[2] *See* Prospectus at 153 ("This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits and schedules filed therewith.").

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

seller, offeror, control persons, and/or underwriter of the shares sold pursuant to the Offering, each of the Defendants are strictly liable for such misstatements and omissions therefrom.

10.     Further, because of the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk, and uncertainties.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations).

11.     As alleged herein, Defendants failed in their duty by inducing public investment in the Company by means of the materially untrue, inaccurate, misleading, and/or incomplete Offering Materials.  As a result of the materially misleading Offering Materials, the Company's share price was inflated at the time of the October 12, 2017 IPO, through which Restoration Robotics raised approximately $25 million in gross proceeds.

12.     The effects of these undisclosed material adverse trends and conditions would eventually come to a head, with the Company's sales and marketing function failing to increase procedure based revenue because of, *inter alia*, its inability to generate sufficient patients leads, leading to unhappy physician clients who lowered their usage of the ARTAS System or abandoned the procedure all together.  Further, the Company's sales force was hamstrung by numerous widespread product defects related to the ARTAS System and the nebulous release date of the implantation feature for the ARTAS System, resulting in prospective physicians taking a wait-and-see approach, decreasing systems sales revenues – a problem compounded by the fact that international sales had slowed significantly in the wake of decreased product demand following increased warehousing by third-party distributors, resulting in sales of machines that were never installed in the field or capable of producing recurring procedure revenue.

13.     Unfortunately for Restoration Robotics stockholders, the Company's stock has consistently traded lower than the $7.00 Offering price, weighed down by the truth regarding the Company's business and financial prospects.

14.     As alleged herein, Plaintiff, individually and on behalf of similarly situated Class

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(defined herein) members who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act.

### JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77(o).

16. This Court has subject matter jurisdiction over this action under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

17. Venue is proper in this judicial district pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) because the false and misleading statements at issue took place and had an effect in this district. Additionally, pursuant to 28 U.S.C. § 1391(b), certain Defendants have sufficient contacts with California, including the Company's principal executive offices being located in this district, Individual Defendants Ryan Rhodes, Charlotte Holland, Jeffrey Bird, Gil Kliman, and Emmett Cunningham, Jr. each reside in this district, and certain of the Venture Capital Defendants and Underwriter Defendants (each defined below) have an office and/or practice in this district, and each maintains substantial and continuous contact with California by conducting significant venture capital and/or investment banking operations in this district and throughout this State.

18. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

### PARTIES

**A.   Plaintiff**

19. Plaintiff, as set forth in the Certification previously filed and incorporated herein by reference (ECF No. 19-2) purchased Restoration Robotics common stock pursuant and/or traceable to the Offering Materials issued in connection with the Company's IPO and has been damaged thereby.

**B.   Restoration Robotics**

20. Restoration Robotics is a medical technology company founded in 2002, organized

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

under the laws of the State of Delaware and headquartered at 128 Bayetch Drive, San Jose, California 95134. The Company's shares trade on the NASDAQ Global Market under the ticker symbol "HAIR."

### C.    The Individual Defendants

21.    Ryan Rhodes ("Rhodes") is, and was at the time of the IPO, Restoration Robotics' President, Chief Executive Officer ("CEO") and a member of the Restoration Robotics Board. Rhodes has been a Company director and its CEO since 2016. Rhodes signed or authorized the signing of the Company's Registration Statement. Upon information and belief, defendant Rhodes resides in this district.

22.    Charlotte Holland ("Holland") was, at the time of the IPO, Restoration Robotics' Chief Financial Officer ("CFO"). Holland was the Company's CFO from 2016 until December 2017. Holland signed or authorized the signing of the Company's Registration Statement. Upon information and belief, defendant Holland resides in this district.

23.    Defendants Rhodes and Holland are sometimes collectively referred to herein as the "Management Defendants."

24.    Frederic Moll ("Moll") is, and was at the time of the IPO, Restoration Robotics' Chairman of the Board. Moll has been a Company director since 2002. Moll signed or authorized the signing of the Company's Registration Statement.

25.    Jeffrey Bird ("Bird") is, and was at the time of the IPO, a member of the Restoration Robotics Board and signed or authorized the signing of the Company's Registration Statement. At the time of the IPO, Bird was also the managing director at Sutter Hill Ventures. Upon information and belief, defendant Bird resides in this district.

26.    Gil Kliman ("Kliman") is, and was at the time of the IPO, a member of the Restoration Robotics Board and signed or authorized the signing of the Company's Registration Statement. At the time of the IPO, Kliman was also the managing director at InterWest Partners, including defendant InterWest Management Partners IX, LLC. Upon information and belief, defendant Kliman resides in this district.

27.    Emmett Cunningham, Jr. ("Cunningham") was, at the time of the IPO, a member of the

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Restoration Robotics Board and signed or authorized the signing of the Company's Registration Statement.  At the time of the IPO, Cunningham was also the managing director at Clarus Ventures, LLC and a managing member of Clarus Lifesciences II, L.P.  Upon information and belief, defendant Cunningham resides in this district.  The Company announced on August 26, 2018 that defendant Cunningham would not stand for re-election at Restoration Robotics' annual meeting and he was replaced on the Board effective July 1, 2018.

28.     Craig Taylor ("Taylor") is, and was at the time of the IPO, a member of the Restoration Robotics Board and signed or authorized the signing of the Company's Registration Statement.  At the time of the IPO, Taylor was also the president at Alloy Ventures, Inc. and managing director of Alloy Ventures 2002, LLC and Alloy Ventures 2005, LLC.

29.     Shelley Thunen ("Thunen") was at the time of the IPO, a member of the Restoration Robotics Board and signed or authorized the signing of the Company's Registration Statement.

30.     Defendants Rhodes, Holland, Moll, Bird, Kliman, Cunningham, Taylor, and Thunen are sometimes collectively referred to herein as the "Individual Defendants."

31.     The Individual Defendants each participated in the preparation of and signed (or authorized the signing of) the Registration Statement and the issuance of the Offering Materials. Defendant Restoration Robotics and the Individual Defendants are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement.  By virtue of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Restoration Robotics' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

### D.      The Venture Capital Defendants

32.     Defendants Sutter Hill Ventures, L.P.; Clarus Lifesciences II, L.P.; Clarus Ventures II, LLC; Alloy Ventures 2002, L.P.; Alloy Ventures 2005, L.P.; Alloy Ventures 2002, LLC; Alloy Ventures 2005, LLC; Interwest Partners IV, L.P.; and Interwest Management Partners IX, LLC (collectively, the "Venture Capital Defendants") are entities that hold a substantial venture capital stake in Restoration Robotics.  They precipitated the IPO in part through registration rights obtained contractually by their investment as principal stockholders, as well as through their substantial

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    participation in the Company's Board through defendants identified herein that were appointed to the

2    Board by the Venture Capital Defendants and who served at their behest.  The Venture Capital

3    Defendants beneficially owned, through partnerships they controlled and their related-party

4    defendants, approximately 55.3% of Restoration Robotics shares at the time of the IPO through their

5    control of Series A through Series C convertible Preferred Stock (the "Preferred Stock").   The

6    Preferred Stock automatically converted into publicly tradable common stock immediately prior to the

7    completion of the IPO on a one-to-one basis and represented more than half of the voting power on

8    Restoration Robotics' Board just prior to the IPO.  As set forth herein, defendants Bird, Cunningham,

9    Taylor, and Kliman each controlled certain of the Venture Capital Defendants.  Thus, four of the

10   Board's seven seats were held by the Venture Capital Defendants, allowing them to effectively control

11   Restoration Robotics and cause its IPO.

12        33.    Each of the Venture Capital Defendants maintains offices and/or operates in this

13   district.

14        **E.**    **The Underwriter Defendants**

15        34.    Defendant National Securities Corporation ("National Securities") acted as an

16   underwriter for the Company's IPO.  In the offering, National Securities agreed to purchase 2,145,000

17   shares of the Company's common stock, exclusive of any over-allotment option.

18        35.    Defendant Roth Capital Partners, LLC ("Roth") acted as an underwriter for the

19   Company's IPO.  In the offering, Roth agreed to purchase 715,000 shares of the Company's common

20   stock, exclusive of any over-allotment option.  Roth maintains a regional office in this district at

21   185 Berry St., Suite 1050, San Francisco, California 94107.

22        36.    Defendant Craig-Hallum Capital Group LLC ("Craig-Hallum") acted as an underwriter

23   for the Company's IPO.  In the Offering, Craig-Hallum agreed to purchase 715,000 shares of the

24   Company's common stock, exclusive of any over-allotment option.

25        37.    Defendants National Securities, Roth, and Craig-Hallum are referred to herein as the

26   "Underwriter Defendants."  Each of the Underwriter Defendants received commissions for their

27   participation in the IPO, receiving $0.49 for every share underwritten, totaling approximately

28   $2 million, inclusive of proceeds from the over-allotment option, which the Underwriter Defendants

1    exercised to purchase an additional 322,910 shares.

2        38.   Per the Form of Underwriting Agreement filed as an exhibit to the Registration

3    Statement, each Underwriter Defendant agreed, severally and not jointly, to purchase from the

4    Company the number of firm shares plus any optional shares upon the exercise of the Underwriter

5    Defendants' option.

6        39.   In the run-up to the IPO, the Underwriter Defendants: (i) assisted in the preparation and

7    presentation of Restoration Robotics "road show" materials designed to induce investment in the

8    Company; (ii) conducted due diligence on the Company, including, *inter alia*, access to confidential

9    corporate information concerning Restoration Robotics' business operations unknown to the investing

10   public; and (iii) consulted with Company management regarding the content of the Registration

11   Statement.

12       40.   Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially

13   untrue and misleading statements in the Offering Documents.  The Underwriter Defendants assisted

14   Restoration Robotics and the Individual Defendants in planning the IPO and were required to conduct

15   an adequate and reasonable investigation into the business and operations of Restoration Robotics—a

16   process known as a "due diligence" investigation.  During the course of their due diligence

17   investigation, the Underwriter Defendants had continual access to confidential corporate information

18   concerning Restoration Robotics' operations and financial prospects.

19       41.   In addition to availing themselves of virtually unlimited access to internal corporate

20   documents, agents of the Underwriter Defendants met with Restoration Robotics' lawyers,

21   management, and top executives and made joint decisions regarding: (i) the terms of the IPO,

22   including the price at which Restoration Robotics shares would be sold to the public; (ii) the strategy

23   to best accomplish the IPO; (iii) the information to be included in the Offering Materials; and (iv) what

24   responses would be made to the SEC in connection with its review of the Offering Materials.  As a

25   result of those constant contacts and communications between the Underwriter Defendants'

26   representatives and Restoration Robotics' management and top executives, the Underwriter

27   Defendants knew of, or in the exercise of reasonable care should have known of, Restoration

28   Robotics' existing problems as detailed herein.

42.     The Underwriter Defendants negligently allowed the Offering Materials to contain materially untrue and misleading statements and/or omissions and failed to act in a reasonable manner to prevent the Offering Materials from containing materially misleading statements and/or preventing the materially misleading Offering Materials from being disseminated.

43.     On this basis, the Underwriter Defendants knew, or should have known, of Restoration Robotics' existing business concerns and shortcomings, as discussed *infra*, and, pursuant to the Securities Act, are liable for the false and misleading statements in the Registration Statement.

## RELEVANT BACKGROUND

### A.     Confidential Witnesses

44.     Plaintiff's allegations are supported by CWs, each of whom was employed by Restoration Robotics prior to the IPO and who maintain confidential knowledge related to the allegations set forth herein.

45.     CW 1 was a Practice Success Manager ("PSM") (previously known as a Practice Development Manager) at Restoration Robotics from October 2015 to September 2017. Thereafter, CW 1 became a Restoration Robotics customers from the end of 2017 to the present.

46.     According to the Offering Materials, a Restoration Robotics PSM is:[3]

> ***responsible for helping [Restoration Robotics'] physician customers build awareness and market the ARTAS procedure and increase ARTAS brand-awareness*** . . . [PSMs] form strong relationships with [the Company's] customers and consult on how to integrate the ARTAS System into their practices, while raising awareness of the procedure among potential patients. . . ***[Company] PSMs work closely with the team that will manage the ARTAS business at the practice level to establish goals and develop detailed strategies to achieve these goals***. This includes extensive training and coaching with respect to the patient consultation process. . . In addition, PSMs consult on methods to raise awareness of the ARTAS procedure through practice events, public relations, television, and radio advertising and other channels.

47.     CW 1 reported to Brent Nixon, Restoration Robotics' Vice President of Global Sales, who reported directly to defendant Rhodes.

---

[3] Unless otherwise indicated, all emphasis is added.

9

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

48.     CW 2 was a Practice Success Manager at Restoration Robotics from March 2017 to January 2018.   CW 2 reported to Joey Brown, the Company's former Director of Business Development, until his resignation, and then to his replacement, Greg Anderson.  Both Messrs. Brown and Anderson reported directly to defendant Rhodes.

49.     CW 3 was a Regional Sales Manager ("RSM") at Restoration Robotics from September 2016 to October 2017.   According to the Offering Materials, a Restoration Robotics RSM is "responsible for coordinating and executing the direct sales of the ARTAS Systems." CW 3 arrived at the Company along with five other RSMs as part of the Company's efforts to put in place experienced medical device salespeople with successful track records at other companies selling to aestheticians and plastic surgery practices.  In her role, CW 3 reported to Brent Nixon, who reported directly to defendant Rhodes.

### B.     Company Overview

50.     Restoration Robotics was incorporated in 2002 under the laws of the State of Delaware. At the time of the IPO, the Company had three wholly-owned subsidiaries: (i) Restoration Robotics, Inc. Limited, incorporated under the laws of Hong Kong, (ii) Restoration Robotics Europe Limited, incorporated under the laws of the United Kingdom, and (iii) Restoration Robotics Korea Yuhan Hoesa, incorporated under the laws of the Republic of Korea.

51.     As stated in the Offering Materials, the Company describes itself as "developing and commercializing a robotic device, the ARTAS System that assists physicians in performing many of the repetitive tasks that are a part of a follicular unit extraction surgery, a type of hair restoration procedure."

52.     In the Offering Materials, filed October 13, 2017, the Company described its product, as well as its regulatory approvals, as follows:

> We believe the ARTAS System is the first and only physician-assisted robotic system that can identify and dissect hair follicular units directly from the scalp and create recipient implant sites. The ARTAS System includes the ARTAS Hair Studio application, an interactive three-dimensional patient consultation tool that enables a physician to create a simulated hair transplant model for use in patient consultations.

\* \* \*

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> The ARTAS System is comprised of the patient chair, the cart, which includes the robotic arm, integrated vision system, artificial intelligence algorithms and a series of proprietary end effectors, which are the various devices at the end of the robotic arm, such as the automated needle and punch, that interact with the patient's scalp and hair follicles and perform various clinical functions.

53.   In April 2011 the Company received FDA clearance to market the ARTAS System in the U.S. for dissecting hair follicles from the scalp in men diagnosed with androgenic alopecia ("AGA") who have black or brown straight hair.

54.   The ARTAS System purportedly differentiates itself from other less effective (*i.e.*, prescription medicines, wigs or spray-on applications) or more invasive courses of treatment for AGA (*i.e.*, follicular unit transplantation ("FUT") or strip surgery, which involves the dissection of a large tissue strip from the patient's scalp, the manual removal of hair follicles from the strip, and the implantation into prepared implant sites on the scalp) by "robotically assisting a physician through many of the most challenging steps of the hair restoration process."

55.   At the time of the IPO, the ARTAS System was the Company's sole product.

56.   At the time of the IPO, Restoration Robotics had received clearance to sell the ARTAS System in 61 different countries, selling directly in the following regions: the European Economic Area ("EEA"), United States, Korea, Hong Kong, Singapore, Spain, Poland, Benelux, and Scandinavia.

**C.    The Company Operates on the Razor/Razor Blade Model to Secure Recurring Revenue from Physician Clients**

57.   The Offering Materials present the hair loss market as underserved and primed for a future boom:

> **The Hair Loss Market**
>
> According to the census conducted by ISHRS, in 2010, more than $1.8 billion was spent globally on both non-surgical and surgical hair loss treatments. In general, the global market for aesthetic procedures marketed towards men is significant and growing. For example, according to ASAPS statistics, the number of aesthetic procedures performed on men in the U.S. increased 325% from 1997 to 2015, to approximately $1.3 billion. The patient market for hair loss is significant with approximately 35 million men suffering from AGA in the United

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    States alone.

58.    To capitalize on this growing segment, Restoration Robotics was not only required to sell its ARTAS System to physicians, but would also need those physicians to *continue* using the system to generate recurring revenue for the Company in the form of the dollar-per-follicle royalty paid in advance of any procedure.

59.    As set forth in the Offering Materials, the Company's revenue composition is split among three categories: (i) system revenue; (ii) procedure based revenue; and (iii) service related fees:

|  | Year Ended December 31, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2015 | 2016 | 2016 | 2017 |
|  | *(in thousands)* | | | |
| Systems | $ 10,594 | $ 7,193 | $ 2,652 | $ 6,448 |
| Procedure based | 5,766 | 6,927 | 3,496 | 3,834 |
| Service related fees | 870 | 1,480 | 598 | 982 |
|  | $ 17,230 | $ 15,600 | $ 6,746 | $ 11,264 |

60.    System revenue is one-time revenue received by the Company for the sale of an ARTAS System.

61.    According to the Offering Materials, during the twelve months ended December 31, 2016, the Company sold 32 ARTAS Systems, accounting for approximately $7.2 million in revenue and an average sales price of approximately $225,000 per ARTAS System.  The revenue per system sold ticked up slightly during the first half of 2017 to approximately $240,000.

62.    Procedure based revenue includes recurring revenue flowing from a physician customer who must pay in advance to use their ARTAS Systems.  According to the Offering Materials, "physician customers in the U.S. generally pay in advance on a per follicle-basis for the follicles to be harvested, and on a per procedure basis for Site Making. Outside of the U.S., physician customers pay in advance, generally on a per procedure basis for both follicle extraction and Site Making."

63.    According to the Prospectus, as of the end of December 31, 2016, the Company had sold 206 ARTAS systems worldwide, which generated approximately $6.9 million in procedure based revenue, or $33,500 per installed system during that year.

64.    Service related fees are generated from post-warranty maintenance service and support

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

contracts offered by the Company.

65.    According to the Prospectus, at the time of the IPO, "the total number of procedures ha[d] not increased proportionally with the increase in [the Company's] installed base and the number of procedures performed tend[ed] to vary from quarter-to-quarter," an issue ascribed in the Prospectus to, *inter alia*, (i) slow physician ramp ups to utilizing the ARTAS System; (ii) capacity limitations among the current installed base; and (iii) seasonality factors.

### D.    Overview of the Company's Sales Force and Growth Strategy

#### 1.    In the Offering Materials, the Company Claimed it Had a Sales Force Uniquely Capable of Selling the ARTAS System Domestically and a Distributor System to Drive Sales Abroad

66.    According to the Offering Materials, in the United States, the Company relied on a direct sales and marketing team to sell the ARTAS System to physicians, provide services, and generate procedure based revenue "by helping [Restoration Robotics'] physician customers build their hair restoration practice."   To do so, the Company relied on a team of regional sales managers ("RSMs"), Clinical Trial Managers ("CTMs"), and Practice Success Managers ("PSMs").

67.    *RSMs*.   The Prospectus states that RSMs "are responsible for coordinating and executing the direct sales of the ARTAS Systems" and that the average RSM in the United States had more than eight years of experience selling aesthetic capital equipment.   As of May 31, 2017, the Company employed seven RSMs.

68.    *CTMs*.   The Prospectus states that CTMs are responsible for providing "high quality, comprehensive training and education to physicians on the use of the ARTAS System and on how to build their hair restoration practices."   As of May 31, 2017, the Company employed seven CTMs "with an average of over 12 years of experience in training physician practices in hair restoration or other aesthetics procedures and surgery."   The Offering Materials highlight the importance of the CTMs in the sales and adoption process, as "a key to adoption and utilization of the ARTAS System is clinical confidence in the ARTAS System technology and procedure" – confidence that is purportedly gained following on-site training.

69.    *PSMs*.   As described in the Prospectus, PSMs work alongside physician clients to help

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"build awareness and market the ARTAS procedure and increase ARTAS brand-awareness." To do so, the Company purportedly provides "easily implemented marketing tools allowing practices to create individually tailored website content, direct mail advertisements, print ads for magazines and newspapers and brochures" to be used by the physician as she integrates the ARTAS System into her practice. PSMs also "consult on methods to raise awareness of the ARTAS procedure through practice events, public relations, television, and radio advertising and other channels." According to the Prospectus, as of May 31, 2017, the Company employed seven PSMs who "average[d] over ten years of experience in developing hair restoration practices and aesthetics practices."

70.     This sales and marketing function had purportedly been bolstered by the Company in recent years, particularly in the United States, with Restoration Robotics representing in the Prospectus that it had made a "significant investment" in the team:

> As a result of declining ARTAS System unit sales in the U.S. and other regions in the second half of 2015 and early 2016, we introduced a new leadership team, made certain strategic changes to and investments in our U.S. sales and global marketing organizations, which included terminating certain personnel and hiring new personnel and realigning our reporting and leadership structure in the sales organization. *For example, we increased the size of our U.S. sales force by hiring sales professionals with extensive experience selling to physicians in the aesthetic market.*

71.     Internationally, the Company maintained a limited direct sales force in addition to a network a third-party distributors. According to the Prospectus:

> As of August 1, 2017, we have three regional directors overseeing Asia, Europe, the Middle East, Africa and Latin America. These regional directors are responsible for coordinating direct sales, as well as the management of our distribution partners within these regions. There are four sales personnel directly selling in nine countries, as well as an international sales team of 14 employees supporting 21 independent distributors who market the ARTAS System in 29 countries.

72.     Thus, Restoration Robotics assured investors that the Company was uniquely equipped to commercialize the ARTAS System through its blended sales arm that included a team of well-qualified sales personnel not only making direct sales to physicians, but also engaging in widespread marketing efforts to drive increased utilization (and procedure-based revenue) in the United States.

### 2.      The Company's Purported Growth Strategy

73.      The Prospectus sets forth the Company's four prong strategy for expanding the commercialization of the ARTAS System:

- Broaden our physician customer base to include additional physician specialties, such as dermatology and plastic surgery.

- Expand our international business by adding distributors and sales support staff to increase sales and strengthen physician relationships in our international markets.

- Continue to innovate and introduce new features such as the robotic implantation functionality (which is in clinical development), continue to refine our Harvesting technology and user interface, and potentially pursue expanding our cleared indications of use.

- Drive increased utilization of the ARTAS System by working collaboratively with our physician customers to increase the number of ARTAS procedures that are performed.

74.      Yet, unbeknownst to investors, and as discussed below, prior to and at the time of the IPO, Restoration Robotics failed to provide viable customer leads to physicians and, thus, physicians abandoned using the ARTAS System and procedures were declining. Moreover, the ARTAS System was plagued with a number of defects that led to increased patient and physician dissatisfaction, negatively impacting the ability to both sell the system and increase its usage.

**UNDISCLOSED MATERIALLY ADVERSE CONDITIONS AND TRENDS THAT EXISTED PRIOR TO AND AT THE TIME OF THE IPO**

**A.      The Company's Failure to Provide its Customers with Promised High Quality Patient Leads and Undisclosed Additional Costs Cause Restoration Robotics to Lose Significant Business and Revenue as Physicians Abandon ARTAS**

75.      According to the Offering Materials, the robotic nature of the ARTAS System allowed the Company to target an array of physicians outside of traditional hair surgeons, opening the door to several other categories of doctors seeking a turnkey addition to their existing practice:

We believe the ARTAS System provides physicians compelling economic benefits and enables physicians to achieve consistent reproducible results. As a result, we believe the ARTAS procedure also offers an attractive addition to existing dermatology, plastic surgery or

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

aesthetics practices that do not provide hair restoration procedures.

- Hair restoration procedures are generally paid for by the patient and do not involve the complexity of securing reimbursement from third-party payors.

- The ARTAS System's image-guided robotic capabilities allow physicians to perform hair restoration procedures with fewer staff required than a traditional strip surgery or a manual FUE procedure. Procedures can also be performed with less physician and technician fatigue.

- Because we provide high quality training for physicians and their clinical teams on the use of the ARTAS System and because the robotic system and its intelligent algorithms assist these teams in performing hair restoration procedures, we believe we can significantly shorten the learning curve necessary for hair transplantation procedures using the ARTAS System. This shorter learning curve can reduce barriers to entry for a new hair restoration practice. It can also ease the adoption of a new technology into existing practices.

76.     With the automated procedure provided by the ARTAS System, the Company purportedly reduced the "barriers to entry in a field that previously required substantial training," resulting in more than 80% of its customer base comprised of physicians who ***do not*** specialize in hair transplant surgery:

> According to data collected by us in 2017, the ARTAS System is used by different types of practitioners, including doctors specializing in hair transplant surgery, dermatology, plastic surgery, cosmetic surgery, general surgery, family medicine and all other practitioners, each representing 18%, 22%, 23%, 10%, 4%, 2% and 21%, respectively, of our customer base.

77.     The goal, as espoused by the Company as an element of its growth strategy in the Prospectus, was to "broaden [Restoration Robotics'] physician customer base" by differentiating itself from its non-robotic competitors in the hair transplant space whose products required greater specialization.

78.     The key to convincing these non-hair specialist doctors to make the significant financial investment in the ARTAS System was conveying the economic benefits such procedures would yield,

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   particularly from the purported steady stream of already interested prospective patients, the identities

2   of whom the Company would provide through its patient lead program.

3          79.    The promise of having ready-made clientele served as the crux of the Company's pitch

4   to prospective doctors to induce purchases of the ARTAS System. However, according to CW 1, in

5   reality, Restoration Robotics did not have an inventory of patient leads. Thus, CW 1 stated, the

6   Company's sales staff sold ARTAS Systems to unsuspecting physicians by misrepresenting to doctors:

7   (i) the marketing support the Company would provide the doctor following the purchase, including the

8   provision of high quality patient leads that would allow the physician to recoup their initial investment

9   quickly; (ii) the quality of the marketing support the Company had at its disposal, claiming the

10  Company had significantly invested in digital marketing, when in fact the Company relied on

11  traditional, less effective means; (iii) the time a given PSM would be able to devote to the upstart

12  doctor to help establish a practice; and (iv) the actual functions and features of the ARTAS System,

13  including its ease of use.

14         80.    CW 1 recounted her firsthand experience accompanying other members of the sales

15  staff to pitch the sale of ARTAS Systems to prospective customers using the promise of patient leads

16  to entice a physician to purchase.  According to CW 1, the Company's sales personnel represented to

17  prospective customers that the volume of end-user leads that the Company would provide would be

18  sufficient to pay for the machine within a year or less, even going as far as to employ a formula that

19  presented the prospective customer's breakeven point on her initial investment in the machine on a

20  procedures per month basis.  CW 2 corroborated CW 1's account, stating that Restoration Robotics'

21  sales staff used the promise of patient leads to convince new doctors to adopt the ARTAS System.

22         81.    CW 1 stated that sales personnel represented to prospective customers that Restoration

23  Robotics was able to generate this stream of patient leads as a result of its significant investment in

24  social media.

25         82.    However, when it came to developing and providing these leads, CW 2 and the other

26  PSMs often ran headlong into a brick wall.  As described by this witness, the initial lead was provided

27  by the Company's corporate office to the PSM who was then required to contact the lead to gauge

28  their interest and direct them to a physician client for additional discussion.  Yet the majority of these

1  individuals responded to the PSM's initial inquiry with confusion, asserting that they had never

2  "signed up" for restoration services and had "no idea" about the Company.  CW 2 stated that the lead

3  issue was widespread and often the subject of internal complaints among the PSMs and by physicians

4  who were upset with the quality and quantity of leads that ultimately did flow through to them, with

5  CW 1 stating that during her time with the Company, she recalls Company leads generating just one

6  actual patient customer in her territory.

7       83.    As described by CW 1, far from having widespread digital marketing capabilities, the

8  Company relied on traditional methods of marketing and advertising like brochures, pamphlets, and

9  lobby posters – none of which generated interest in patients off the street and at best were only

10  effective once a potentially interested patient was already in the doctor's office.  Thus, the Company's

11  marketing arm failed to deliver the patients promised to physicians, who soon learned as much after

12  taking delivery of a system and having few, if any, patients to show for it.

13       84.    Both CW 1 and 2 also recalled the illogical nature of the Company's PSM territory

14  map, which required PSMs to support doctors across widely dispersed geographic regions.  This

15  geographical dispersion made it difficult to assist doctors in getting their practice off the ground,

16  leading to further discontent amongst doctors who were led to believe that they would have regular

17  support from the Company following a system purchase.

18       85.    As a result of failing to provide high quality leads and effective marketing support to its

19  physician customers, Restoration Robotics saw its procedure revenue continue to lag behind its

20  systems revenue, despite the fact that additional systems in the field for longer periods of time should

21  have eliminated any "ramp up" delay as a doctor got her practice up and running.

22       86.    Finally, CW 1 stated that the ARTAS System could not perform in the manner in which

23  the sales force described it to doctors, leading many physicians to experience significant buyer's

24  remorse, with CW 3 recounting the negative reputation the system had developed among the

25  community of doctors.

26       87.    For example, CW 1 recalls members of the sales team pitching the ARTAS System to

27  doctors as being capable of harvesting an exceptional number of follicles per hour.  In actuality, this

28  figure had been extrapolated from the machine's performance in optimal conditions over a much

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

shorter period of time (*i.e.* 50 follicles over a 20 second period). Doctors were not informed that this performance was an extrapolation of optimal performance of the machine and were soon blindsided with an extraction and harvesting procedure taking upwards of three to five hours – a major downside as federal law requires a licensed doctor to be in the room at all times while the robot is running, effectively grinding the physician's work day to a halt.

88.    Thus, for what was supposed to be a turnkey value addition to a doctor's existing practice actually required a significant time investment on the part of the physician while foregoing other faster and more lucrative procedures.

89.    The value proposition further diminished as doctors were subject to additional per procedure fees associated with using the ARTAS System.

90.    For example, while the ARTAS System was sold as a turnkey solution to be operated by one doctor and one nurse or technician, in actuality, the system required a three to four person team to operate effectively. This meant that unless a doctor wanted to sacrifice members of her existing support staff to the lengthy procedure, she would have to bring in independent contractors to assist on each procedure at a cost of between $300 to $400 per procedure, each.

91.    According to CW 1, doctors were often blindsided by this additional financial outlay, as Restoration Robotics' sales force had led its customers to believe that the Company would be providing all necessary support, including marketing and technical support.

92.    Further, CW 1 stated that the Company's focus on non-hair surgeons resulted in a material number of physicians never developing the manual skills to implant the follicles extracted by the ARTAS System, whether by choice because of the opportunity costs related to the required time commitment drawing the doctor away from her established practice, or because of simply never grasping the technique. In either circumstance, this witness recalls these physicians simply discontinuing their use of the system.

93.    The result was widespread dissatisfaction leading to a lack of utilization with the Company's only product offering, with CW 1 stating that, to this day, there exists a large crop of

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

physicians seeking to unload their ARTAS Systems at a discount.[4]

**B.    The ARTAS System is Riddled with Product Issues That Cause Doctors to Demand Refunds or Abandon the Product Altogether**

94.    Prior to the Class Period, and continuing through today, the ARTAS System was plagued with product issues that have resulted in many doctors being unable to perform procedures and/or dropping the platform all together, turning the robot into an "expensive coatrack," as described by CW 1.

95.    CW 1 specifically recalls widespread issues with the Company's disposables kit, including the needles used to extract the hair follicles – a required purchase from Restoration Robotics in order to perform a surgery. The disposable kits were provided when a doctor prepaid for a set number of follicles.  However, the plastic components of the kits were prone to failure, meaning that a doctor would often have to buy additional kits from Restoration Robotics to maintain a surplus on hand in order to complete a procedure, raising the costs associated with using the machine.

96.    As described by this witness, every patient seeking to undergo a hair restoration procedure has a finite number of donor hair, found at the back of the head.  These donor hairs are harvested by the ARTAS robot during the extraction portion of the procedure.  The goal, according to CW 1, is to maximize the yield of implantable follicles from those donor hairs, with the Company promising physicians yields of upwards of 90%.

97.    What was actually occurring, however, was that the needles physicians were required to purchase from the Company for use with the machine were damaging grafts during the extraction process, dropping yield to as low as 50%.  The impact was twofold.

98.    *First*, angry doctors were required to pay the Company in advance for the total number of follicles extracted, regardless of yield, meaning they were being forced to pay nearly double in royalties to extract a sufficient number of follicles to perform the procedure.  *Second*, those increased costs were then passed on to upset patients, who had effectively sacrificed an irreplaceable number of follicles for no other reason besides the faulty needle.

---

[4] In fact, a review of the popular auction site eBay shows that, at the time of this complaint's filing, four Restoration Robotics ARTAS systems are for sale, ranging from $65,000 to $169,000.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

99.     Understandably, doctors who incurred a reputational hit as a result of their angry patients turned to the Company for a response.   According to CW 1, they were met not with understanding and a solution, but with blame, as Restoration Robotics ignored the issue and told customers it was user error that caused the low yield, despite the widespread nature of the problem.

100.    The decision by a doctor to simply stop using the ARTAS System all together was not uncommon. According to CW 3, upon her arrival at the Company in 2016, *13 doctors in her region alone* (representing more than 6% of all ARTAS Systems that had been sold globally to that point and more than 14% of the total number ARTAS Systems reported by the Company as having been sold in the United States by the middle of 2017) were not using their ARTAS system in any manner.

101.    CW 1 stated that other issues relating to software glitches were commonplace with the ARTAS System.   According to this witness, because the robot relies on its computer to function, glitches in the system would cause some doctors' machine to be inoperable for long stretches of time, leading to further customer discontent.

## C.      Restoration Robotics' ARTAS System Is Cost-Prohibitive for Doctors Due to High Up Front Cost and Undisclosed Additional Procedure Costs

102.    According to CW 3, Restoration Robotics faced significant challenges to selling the ARTAS System.   *First*, the Company's strategy of targeting non-hair surgeons meant that these otherwise unskilled doctors (*e.g.*, dentists that lacked experience with hair transplant surgeries) would be forced to make a significant commitment to their hair transplant practice, at the expense of the rest of their practice, if they wanted to see any real revenue from their investment of $250,000 to $300,000 for the ARTAS machine. Thus, the cost of the ARTAS System was cost-prohibitive for many of these doctors whose only alternative for financing the expansion was to take out a loan, notwithstanding the misrepresentations made to these customers of the supposed ease with which they would be able to recoup their investment. This meant many doctors would not buy it.

103.    *Second*, as these doctors who did purchase the ARTAS System would soon learn, according to CW 3, the ARTAS system was not nearly as fast or efficient as originally represented. This slowness and the increased need to consult with patients both before and after the procedure required the non-hair surgeon customers who purchased the system to devote at least one to two full

days every week to hair restoration in order to cover costs.

104.    CW 3 also recounted how, even in the hands of specialized hair surgeons, the ARTAS System was inefficient, resulting in many hair specialists abandoning the product because it was simply faster to harvest follicles and prepare the site for implantation manually.

105.    Customer dissatisfaction was also spurred by the fact that there was a high recurring cost for every hair surgery performed in the form of the $1.00 per follicle royalty each doctor was required to pay to Restoration Robotics before their machine would even function on a given procedure.  This meant for an average surgery requiring the extraction of 2,000 hair follicles, the surgeon was required to charge the patient upwards of $10,000 to $15,000 to cover the 13 to 20% royalty to the Company.  Moreover, to perform the procedure, physicians had to cover costs for consulting with the patient, site making (unless she used the ARTAS System's site making functionality for an additional cost), and manually implanting the robotically extracted follicles.

106.    These economics were simply cost-prohibitive and, according to CW 3 word traveled quickly throughout the medical community, particularly among hair transplant specialists, some whom had already purchased the ARTAS system and incurred the unexpected high costs, and the significant time commitment that was required, and experienced the lack of support from Restoration Robotics, resulting in fewer physicians being willing to invest in the ARTAS System.

107.    According to CW 3, Restoration Robotics held weekly sales team meetings via conference calls on Monday mornings to discuss sales goals, issues, and strategy.  Sales representatives and Defendant Rhodes attended these meetings.  Rather than re-evaluate the Company's sales strategy or address the lead and product issues at these weekly meetings, Rhodes criticized the sales staff for their failure to meet their quota and crafted a "sales pitch" that the sales force was supposed to recite verbatim.  CW 3 viewed the "sales pitch" as futile because the ARTAS System was not sellable through a canned pitch and instead required a technical discussion with doctors and their staff.

108.    According to CW 3, the issues with generating new system sales were compounded by the fact that the Company was seeing extremely limited success from its efforts to market the procedure to the patient public in an effort to increase utilization among its physician customers.  The

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

dollar per follicle hair revenue was supposed to be the major revenue component of the ARTAS System, but the Company's marketing initiatives were unable to gain any real traction.

109.    As discussed above, the Company's failure to provide viable leads to its physicians resulted in a group of PSMs who were "constantly putting out fires." According to CW 1, customers were constantly upset and complaining because they were not getting the support from the Company that they were originally promised.

110.    CW 2 recalled that "none of the doctors" to whom she had been assigned were using the ARTAS Systems they had previously purchased – a common problem throughout the United States according to this witness.

111.    Thus, the ARTAS System hardly provided the "compelling economic benefits" bragged about by the Company in the Prospectus and, in fact, often was an economic drag on a physician's practice as they were required to spend an inordinate amount of time learning to use the machine and performing the lengthy hair restoration procedures – time that could have been better spent elsewhere on more economically valuable tasks.

**D.    Forthcoming Changes to the ARTAS System Stall Sales While Doctors Await the New Product**

112.    At the time of the IPO, the Company was developing a new system capable of robotic implantation functionality. *See, e.g.* Prospectus at 3 ("In addition, we have a robotic implantation functionality in clinical development which, if cleared for marketing, will enable the ARTAS System to implant harvested hair follicles.").

113.    According to the Prospectus, while the robotic implantation functionality was then still in clinical development, Restoration Robotics "expect[ed] to report the results of [the] clinical trial by the end of 2017, and if [it] receive[d] relevant regulatory approvals, [] expect[ed] to be able to offer this enhancement to the ARTAS System in 2018."

114.    The commercialization of the implantation function would be preceded by FDA approval, which the Prospectus stated was expected to occur in 2017:

> We are conducting another clinical study for robotic implantation of dissected hair grafts under an IDE. The clinical trial is a multi-center, blinded clinical study comparing the safety and effectiveness of the

ARTAS System to manual implant of hair follicle. The primary endpoint of this trial is demonstration that the robotic implantation functionality is not inferior to manual implantation as determined by follicle growth at six months and nine months. A total of 32 patients have been enrolled in the trial. We expect to apply for 510(k) clearance in the third quarter of 2017 and expect to receive clearance for the use of the ARTAS System to implant harvested hair grafts by the end of 2017.

115.    Thus, at the time of the IPO, Defendants had clear insight into the commercialization timeline of the robotic implantation functionality, as the Prospectus broadcasted to the world, including prospective Company clients, that a new, more capable robotic system was expected to be rolled out within the next fourteen months.

116.    However, what was not publicly disclosed to investors in the Prospectus was the known material adverse condition and trend related thereto: physicians otherwise interested in purchasing the ARTAS System were refraining from purchasing the existing robot as they awaited word on how the Company intended to integrate the implantation feature to existing ARTAS Systems and/or the announcement of a new model, while refraining from buying the system all together as word of the product's inefficiencies and lack of Company support spread throughout the medical community.

117.    In fact, as stated by CW 3, defendant Rhodes specifically instructed members of the sales force to avoid any mention of the forthcoming implantation feature during the sales pitch because it would only have the effect of causing a delay in a sale or the RSM would have to make a promise of a free device in the future to keep the sales process moving forward.

**E.    Increased Warehousing by International Distributors Leads to Temporary Bumps in System Sales, but No Recurring Procedure Revenue, as ARTAS Systems Are Allowed to Lie Fallow**

118.    As the Offering Materials state as of the Offering, the Company sold its products internationally through 21 independent distributors marketing the ARTAS System in 29 countries.

119.    In those countries where Restoration Robotics used distributors, the third party stepped into the place of the Company, selling, servicing, and supporting the system for the physician customer.

120.    With respect to these distributors, the Company sold the ARTAS System to the third-party pursuant to a master agreement, who then sold it to physicians within their territory.    This

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

contrasted with the direct sales method employed by the Company in the United States.

121.    Unbeknownst to investors, prior to the IPO, sales to Restoration Robotics' international distributors improperly gave the appearance of higher system installations, despite the fact that the majority of these systems were being purchased at a discount by the distributor and warehoused, with no target installation date, and thus no foreseeable procedure revenue.

122.    CW 1 stated that, like clockwork, as fiscal quarters would begin to wind down, the international sales team would present a large bulk order purchase by an international distributor, sold at a discount, bumping the Company's quarterly performance.  These systems would be shipped and system revenues recognized, but the system ultimately remained uninstalled for several months, if at all.

123.    CW 1 specifically recalls this occurring with a distributor in Madrid, Spain, but stated the practice was common.

## THE COMPANY GOES PUBLIC BY MEANS OF THE MATERIALLY FALSE AND MISLEADING OFFERING MATERIALS

124.    On September 1, 2017, the Company filed the draft registration statement with the SEC, announcing an intention to sell an undisclosed number of shares.

125.    On October 6, 2017, the Company filed an amendment to the draft registration statement with the SEC, stating that the Company intended to sell 3,125,000 shares in the offering (exclusive of any overallotment to the underwriters), priced between $7.00 and $9.00 per share.

126.    On October 12, 2017, the SEC declared the Company's Registration Statement, as amended, effective.

127.    On October 13, 2017, the Company filed the Prospectus, as contemplated by the Registration Statement, upsizing the Offering to 3,575,000 shares, but pricing those share at the low end of the $7 to $9 range.

128.    On October 16, 2017, the Company completed its IPO of 3,575,000 shares of common stock at a price of $7.00 per share, for total proceeds of approximately $25 million and net proceeds to the Company of approximately $23.2 million.

129.    The Offering Materials pursuant to which Restoration Robotics conducted its IPO

presented a materially inaccurate, untrue, incomplete, and misleading positive picture of Restoration Robotics' business, performance, and prospects, while omitting crucial realities. In particular, and as discussed further below, the Offering Materials materially misrepresented and failed to adequately disclose the truth concerning: (i) the effectiveness of the Company's sales and marketing teams, including the PSMs who were relied upon to drive increased utilization through the provision of viable patient leads and marketing support; (ii) the quality of the ARTAS System and its ease of use, particularly the needle used to generate a high follicle harvest yield, lowering costs for the physician and purportedly making the system more economically valuable than alternatives; and (iii) the total number of ARTAS Systems actually installed prior to and at the time of the IPO, as the Company's foreign distributors were engaging in widespread warehousing of ARTAS Systems, meaning they were going uninstalled and failing to generate procedure revenue.

### A.   The Offering Materials' Materially False, Misleading and Incomplete Statements Concerning Restoration Robotics' Marketing Function

130.   The Offering Materials presented numerous materially false, misleading, and incomplete statements concerning the Company's marketing function and the ability of those efforts to generate additional procedures for physician clients, and thus additional revenue for the Company through the per follicle royalty and procedure-related purchases.

131.   For example, the Prospectus states:[5]

> We strategically market the ARTAS System to hair restoration surgeons, dermatologists, plastic surgeons and aesthetic physicians. We believe we are able to reach our target physician customers effectively through focused marketing efforts. These efforts include participation in trade shows, scientific meetings, educational symposiums, webinars and other activities. **For physicians who purchase the ARTAS System, we provide comprehensive clinical training, practice-based marketing support, as well as patient leads. For example, we believe we help our physician customers increase the number of procedures performed by assigning a practice success manager, or PSM, to provide assistance in building the physician-customer's hair restoration practice.** Support from a PSM includes the deployment of patient marketing materials, assisting with social media and digital marketing strategies, and other marketing and sales support.

---

[5] Plaintiff alleges that the statements quoted in **<u>underlined, bolded</u>** text are materially false and misleading for the reasons set forth in the Complaint. Any additional text is provided for context.

132. The Prospectus additionally claims as a growth strategy:

**Drive increased utilization of the ARTAS System by working collaboratively with our physician customers to increase the number of ARTAS procedures that are performed.**

133. Further, the Prospectus states:

*Drive Increased Utilization.* In addition to revenues from system sales and servicing, we also generate revenue from procedure based fees. We will continue to work collaboratively with our physician customers to increase utilization by introducing new functionalities, technology and innovations. **In addition, we believe we can increase procedure revenues by helping physicians build their practice through our marketing and training support. To achieve all of these goals, we intend to utilize our teams of clinical training managers, or CTMs, PSMs and field service engineers to work with and to support our physician customers in developing profitable ARTAS practices.**

134. The Offering Materials further materially misled as to the role of PSMs in the Company's U.S. Sales and Marketing function, claiming:

Practice Success Managers

Our PSMs are responsible for helping our physician customers build awareness and market the ARTAS procedure and increase ARTAS brand-awareness. Our PSMs average over ten years of experience in developing hair restoration practices and aesthetics practices. **They form strong relationships with our customers and consult on how to integrate the ARTAS System into their practices, while raising awareness of the procedure among potential patients.** This process often begins before the ARTAS System is installed at the customer site. **Our PSMs work closely with the team that will manage the ARTAS business at the practice level to establish goals and develop detailed strategies to achieve these goals. This includes extensive training and coaching with respect to the patient consultation process. We provide easily implemented marketing tools allowing practices to create individually tailored website content, direct mail advertisements, print ads for magazines and newspapers and brochures.** In addition, PSMs consult on methods to raise awareness of the ARTAS procedure through practice events, public relations, television, and radio advertising and other channels.

135. The Offering Materials also claim:

**We sell the ARTAS System, provide service and generate procedure based revenue by helping our physician customers build their hair restoration practice, through a direct sales force in the U.S.** which, as

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of May 31, 2017, included seven regional sales managers, or RSMs, seven CTMs and seven PSMs.

136.    The above statements were materially false, misleading, and incomplete when made because:

- Restoration Robotics was not providing clinical training and marketing support to customers. Rather, sales personnel were geographically dispersed making it impossible to properly service doctors.

- Restoration Robotics was using antiquated methods of obtaining patient leads through brochures and posters.  Thus, the Company's PSMs were unable to provide patient leads to customers and the majority of leads the Company was supposedly providing had never even heard of the Company.  Thus, such leads did not result in any procedures.

- The assignment of a PSM did not correlate with an increased number of procedures by physicians as a result of the then-existing reality that PSMs were often unequipped to actually help a new doctor get her practice off the ground and it was the doctors who managed their own marketing efforts without relying on the PSMs who were responsible for most of the procedure revenue.

**B.      The Offering Materials' Materially False, Misleading, and Incomplete Statements Concerning the Quality and Design of the ARTAS System**

137.    The Offering Materials also made several materially false, misleading, and incomplete statements about the quality and design of the ARTAS System, including the ability for physicians to perform procedures with less staff assistance than competing methods, as well the ability of the needle to effectively harvest grafts and increase the hair yield for customers.

138.    The Offering Materials state:

The ARTAS System's image-guided robotic capabilities allow **physicians to perform hair restoration procedures with fewer staff required than a traditional strip surgery or a manual FUE procedure**. Procedures can also be performed with less physician and technician fatigue.

139.    The statements in the preceding paragraphs were materially false, misleading, and incomplete when made as they misrepresent the ease of use of the ARTAS System, claiming that the robotic features allow a doctor to perform a procedure with less assistance than traditional or manual

FUE hair restoration options, stated elsewhere in the Prospectus as generally requiring a team of between four and eight. Instead, as stated by CW 1, for an effective hair restoration practice using the ARTAS System, a doctor needed at least four additional technicians to assist, rendering the manpower necessary to perform this procedure functionally equivalent to the others mentioned in the Offering Materials.

140.    With respect to the needle used for harvesting hair follicles, the Offering Materials state:

> The needle travels at approximately 2,500 mm to 3,000 mm per second when it contacts the skin. **This provides targeted precision and a cleanly scored incision.** The punch then spins at 3,000 rpm and loosens the grafts from the surrounding tissue. In a clinical setting, we have observed that the dissection cycle takes between one to two seconds per graft, depending on the length of the graft. In a clinical setting, the ARTAS System has been shown to move from graft to graft at a rate of approximately one to three seconds, thereby enabling the ARTAS System to dissect a graft every two to five seconds, or approximately 720 to over 1,800 grafts per hour. The ARTAS System enables the physicians to adjust dissection parameters to accommodate for different types of skin, and manipulate graft selection algorithms based on patient needs. **The ARTAS System can be programmed to dissect as many grafts as appropriate thus maximizing the use of the donor area. It can also be programmed to dissect grafts with more than two hairs each, thereby increasing the hair yield or the number of hairs per graft.**

141.    The statements in the preceding paragraphs were materially false, misleading, and incomplete when made because, as discussed further herein, the needles used by the ARTAS System had actually suffered from a defect that would cause the machine to damage the donor graft, lowering the harvest yield and causing increased costs to the physician who was paying on a per-follicle extracted basis, as well as wasting valuable donor hairs from the patient's limited donor area.

**C.    The Offering Materials' Materially False, Misleading, and Incomplete Statements Concerning the Number of ARTAS Systems Installed and their Prospects for Revenue Generation**

142.    The Offering Materials also made materially false, misleading, and incomplete statements regarding the number of installed ARTAS Systems comprising the Company's "installed base" and the prospects of those systems to generate revenue.

143. According to the Offering Materials, "[a]s of June 30, 2017, [Restoration Robotics] ha[d] sold 89 ARTAS Systems in the U.S. and 144 internationally," indicating a total number of sold ARTAS units of 233.

144. Relatedly, the Offering Materials state:

> Historically, the majority of our revenue and our revenue growth has been generated through system sales. While we would expect our procedure based fees to continue to increase as our installed base of ARTAS Systems grows worldwide, the total number of procedures has not increased proportionally with the increase in our installed base and the number of procedures performed tends to vary from quarter-to-quarter. During the twelve months ended December 31, 2016, we sold 32 ARTAS Systems and, during the six months ended June 30, 2017, we sold 27 additional systems **representing an aggregate installed base growth of approximately 34% from December 31, 2015, or 174 to 233 systems**, yet our procedure based fee for the six months ended June 30, 2017 increased by approximately 10%, or $0.3 million, from the six months ended June 30, 2016.

145. The statement identified in the preceding paragraph was materially false, misleading, and incomplete because a significant portion of ARTAS Systems purportedly "sold" internationally had not been installed at all.  As discussed further above, the Company's international distributors were purchasing units at steep discounts towards the end of quarters to increase systems revenue, but which meant that these same systems were allowed to lay uninstalled in foreign warehouses as the distributor awaited a physician purchaser.

146. In discussing revenue composition trends, the Offering Materials compound the misrepresentation regarding the Company's "installed base" by stating:

> Historically, the majority of our revenue and our revenue growth has been generated through system sales. While we would expect our procedure based fees to continue to increase as our installed base of ARTAS Systems grows worldwide, the total number of procedures has not increased proportionally with the increase in our installed base and the number of procedures performed tends to vary from quarter-to-quarter. During the twelve months ended December 31, 2016, we sold 32 ARTAS Systems and, during the six months ended June 30, 2017, we sold 27 additional systems representing an aggregate installed base growth of approximately 34% from December 31, 2015, or 174 to 233 systems, yet our procedure based fee for the six months ended June 30, 2017 increased by approximately 10%, or $0.3 million, from the six months ended June 30, 2016.  **We believe that revenue from procedure based fees has not grown proportionally with the increase**

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**in our installed base and varies from quarter-to-quarter due to a number factors, including:**

• physician uptake causing a slow ramp-up to utilizing the ARTAS System, which is particularly evident with physicians who are new to hair restoration procedures or physicians who do not operate a solely hair restoration focused practice who are commonly the profile we are targeting;

• capacity limitations with the current installed base of ARTAS Systems, which can result in procedure based fees not growing as quickly as system sales, as high performing practitioners are limited in the number of procedures that can be performed in any given period;

• **limited or no utilization of the ARTAS System after purchase as a result of a change in physician preference or practice;**

• the concentration of ARTAS procedures being performed on a limited number of ARTAS Systems leading to volatility between periods if particular high volume practitioners perform a smaller number of procedures in a given period which often happens during the summer period; and

• the number of procedures performed vary from quarter-to-quarter as the hair restoration industry is characterized by seasonally lower demand during the summer period when both physicians and prospective patients take vacations.

147. The statements identified in the preceding paragraph were materially false, misleading, and incomplete because they misstate and omit several key factors for why the Company's procedure based revenue failed to grow proportionally with the increase in Restoration Robotics' purported "installed base," including: (i) the Offering Materials misrepresented the "installed base" as all units sold, despite the fact that numerous units were being warehoused by third-party distributors and were not installed or in use, and thus unable to contribute to procedure revenue; and (ii) the "limited or no utilization" of the ARTAS System after purchase was not the result of the generically disclosed "change in physician preference or practice," but, rather, was caused by the Company's failure to provide adequate marketing support (including viable leads), product defects with the needles in the kits, and software glitches and system issues that rendered the ARTAS System economically inefficient for physician customers.

**POST-IPO EVENTS CAUSE RESTORATION ROBOTICS' STOCK PRICE TO PLUMMET AS THE ADVERSE CONDITIONS KNOWN PRIOR TO THE IPO COME TO A HEAD AND NEGATIVELY IMPACT THE COMPANY'S FINANCIAL PERFORMANCE**

148.     Unfortunately for investors, the truth regarding the Company's business and prospects for the future growth would be slowly released to the market by disclosures of poor quarterly performances, low sales volume, stagnant procedure-based revenue, and low utilization rates.

### A.     System Revenues Continue to Plummet as Dissatisfied Doctors Abandon ARTAS

149.     In the months following the IPO, the Company's key procedure revenues continued to flounder, even with the Company's purported provision of marketing services and increased sales.

150.     On May 14, 2018, Restoration Robotics issued a press release announcing its financial results for the first quarter of 2018. The press release disclosed that the Company sold just eight ARTAS Systems in the first quarter of 2018 and that, as a result, the Company's revenue was $5.0 million as compared to $5.5 million in 2017, and system revenue of just $2.4 million – essentially flat as compared to the same quarter of the prior year, despite purportedly having **55 more ARTAS Systems** (representing a 27% increase) installed.

151.     In response, the share price of Restoration Robotics dropped 14.42% from a close of $4.30 on May 14, 2018, to close at $3.68 on May 15, 2018. The Company's stock price would continue to fall in the following trading days, eventually closing at $3.13 on May 30, 2018—a drop of 27% from close of $4.30 on May 14, 2018.

152.     On November 5, 2018, the Company issued a press release announcing its financial results for the third quarter of 2018. The Company reported total revenue of $4.8 million and sales of eleven ARTAS iX (the moniker assigned to the new ARTAS System capable of implantation) systems. Despite an increase in total system sales, procedure-based revenue dropped to just $1.28 million. On the conference call announcing these results, new Restoration Robotics CFO Mark Hair disclosed that not only had procedure revenues fallen (a figure that should have been unaffected by the Company's U.S. pivot given they are derived from legacy systems already purportedly installed), but that *every system sold during the quarter was the ARTAS iX*, indicating no demand for the original ARTAS System:

**David Solomon**

Hey guys, thanks for taking my questions and congrats on the progress in the U.S. First, just housekeeping. Could you guys give us system sales, procedure revenue and service fees for the quarter? I don't think I heard it.

**Mark Hair**

Yes. So as far as system sales go, we had 11 system sales, all of which were iX Systems. 10 of the 11 were in the U.S. and one was OUS.

The system revenue for the quarter was approximately $3 million. And as far as – give me one second here – ***and procedure-based revenue was approximately $1.3 million***, and service-related revenue was about $500,000.

(Emphasis added).

153.    In response, Roth Capital Partners lowered its price target to $4 per share, noting that the lackluster $4.8 million in reported revenue was due in large part by a "24% decline in procedure sales to $1.3 million," well below Roth Capital's target of $2.2 million. Maxim Group, another analyst covering the Company, stated on November 6, 2018 that the "3Q18 revenue miss was driven by lower-than-expected procedure fees with headwinds expected to continue into 4Q18". Maxim Group further noted that it was lowering its projected revenue estimate based on incorporating lower utilization rates into its model. All told, Restoration Robotics share price has decreased from $7.00 per share at the IPO to $1.13 per share as of November 29, 2018.

**B.    Despite Claiming to be Focused on a European Expansion in the Prospectus, the Company Shifts to a "U.S.-Centric" Model Because of an Over-Supply of ARTAS Systems Among its Foreign Distributors**

154.    Despite claiming in the Prospectus that a key element to the Company's growth strategy was the expansion of its international business, where the Company was purportedly "focused on increasing [its] market penetration overseas and building global brand recognition," after the market closed on May 14, 2018, Restoration Robotics issued its first quarter financial results, announcing a pivot to a "more U.S. centric strategy." In response to the results and announcement, the Company's stock price dropped more than 14% on May 15, 2018, closing at $3.68 per share.

155.    In actuality, this "pivot" was the materialization of the undisclosed risk related to

1  international distributors warehousing ARTAS Systems in the run up to the IPO, particularly in the

2  Europe and Middle East region, where CW 1 specifically identified a distributor in Spain.

3  156.    Whereas the Europe and Middle East market had accounted for just 17% of the

4  Company's total revenue in 2015, that percentage jumped to 27% by the third quarter of 2016.  Those

5  numbers continued to stay inflated throughout 2017, comprising 28%, 27%, and 29% of the

6  Company's total revenue for the first three quarters of that year, respectively.

7  157.    The reason, as undisclosed to the Company's investors, was that these international

8  sales were experiencing in inorganic increase by virtue of the distributors purchasing and holding

9  product.

10  158.    The bubble, however, was bound to pop as these distributors would not be able to

11  continue buying and holding stock without increased demand among physicians, resulting in Europe

12  and the Middle East revenues tapering down to 19% and 18% during the first and second quarters of

13  2018, before dropping all the way to 8% during the third quarter following the Company's "pivot."

14  **C.    The Company is Forced to Make a Major Investment in its U.S. Sales Force in an Attempt to Curb Falling Revenues**

15

16  159.    Despite claims in the Offering Materials that the Company's sales force was poised to

17  create huge revenues for the Company, particularly as the uniquely situated PSMs were positioned to

18  help drive new patients to physicians which would lead to increased procedure revenue for Restoration

19  Robotics, those benefits have yet to materialize, with the Company admitting as recently as November

20  5, 2018 in its quarterly report that "the total number of procedures has not followed the increase in our

21  installed base of systems sold."

22  160.    In actuality, the Company's sales force, including the PSMs, had actually declined by

23  December 31, 2017 (and likely had already declined by the time of the Offering, as, by that point, the

24  Company had lost at least two RSMs (CW3 and another individual identified by that witness) and one

25  PSM (CW1)), which went undisclosed until the Company issued its March 5, 2018 annual report,

26  stating that, as of the year's end, the sales team included just four RSMs, six CTMs, and five PSMs.

27  161.    The result was the Company having to make an investment in its sales force, with

28  defendant Rhodes reporting on the May 14, 2018 conference call:

Our U.S team as of this call consists of seven regional sales managers to drive new system placements, up from four as of our last call with an expectation to further expand through the remainder of the year. We additionally have eight practice success managers and one practice development leader focused on driving utilization at the practice level. And last, we have six additional training managers.

Additionally, we've also expanded our inside sales team to respond to inquiries and drive leads generated through various market initiatives to our customers. We are continuing to add regional sales managers as this is one aspect of our plan to enhance our commercial infrastructure as we pivot toward a U.S centric sales strategy to best position ourselves for a sustained growth.

In the near-term, we expect some level of softness as we further optimize and expand our sales teams as the new U.S sales reps take time to become more productive. These measures allow or follow the appointment of the aesthetics industry veterans Greg Anderson as Vice President Market Development, Chris Aronson, as Vice President of Sales, and of course Mark Hair as CFO, each of whom have deep experience in the aesthetics capital in consumable market space.

162.    Despite defendant Rhodes' efforts to attribute sales "softness" to the Company's pivot towards a U.S. focus, the "ramped up" sales force presented in May 2018 closely mirrored the number of employees at the Company in the same positions in May 2017, as reported in the Prospectus:

| Restoration Robotics Sales Force | | |
|---|---|---|
| | As of | |
| 5/31/2017 | 12/31/2017 | 5/13/2018 |
| RSMs          7 | 4 | 7 |
| CTMs          7 | 6 | 6 |
| PSMs          7 | 5 | 8 |

163.    The pivot towards a U.S. based sales policy coincided with the departure of Brent Nixon, former Company Vice President of Global Sales, who had been with Restoration Robotics since 2012.  The Company did not announce Nixon's departure, with the first public hint being the January 5, 2018 announcement of his replacement – Chris Aronson.

164.    The unceremonious dumping of a key member of management so soon after the IPO caused the Company's stock to drop over several days following Aronson's appointment – from $5.16 per share on January 4, 2018 to $4.41 per share on January 10, 2018, or a loss of more than 14%.

165.    The continued disconnect between systems revenue and installed bases, as well as the departure of the global sales head along with several key members of the sales force around the IPO confirm that the representations that the Company was well-armed with the resources to drive new revenue, especially in the procedure space, was materially false, misleading, and incomplete, and caused harm to Plaintiff and the Class.

**D.    The Company Admits that Physicians Are Refraining From ARTAS Purchases While Awaiting the Arrival of the Implantation Function**

166.    As stated above, at the time of the IPO, prospective purchasers of the ARTAS System were refraining from making the significant economic investment to buy a machine which would soon be rendered outdated by the forthcoming commercialization of Restoration Robotics' implantation feature.  As stated in the Prospectus, at the time of the IPO, the Company had "not determined how [its] current ARTAS System will be upgraded for this functionality," only that the Company was "committed to providing [its] current customers a means to access the implantation functionality if and when it is approved."

167.    The Company's unwillingness to commit to upgrading the existing ARTAS machines led to "customer hesitancy relative to the future availability" of the implantation functionality, as admitted by defendant Rhodes in the May 14, 2018 conference call announcing the financial results for the first quarter of 2018:

> As I briefly mentioned earlier, we've seen some hesitancy from some of our physician customers to purchase new systems ahead of the availability of the implantation functionality. While we do expect this to adversely affect short-term sales growth, we see this as a valuable incremental offering in hair restoration technology and see physician hesitancy as a long-term positive as it indicates real interest in the full enhancement capabilities of the ARTAS System.

168.    This was not lost on financial analysts, with Roth Capital Partners lowering its target price for the Company on May 15, 2018, stating "[w]e believe that 1Q18 systems sales indicates that buyers could be awaiting implantation [*i.e.* ARTAS iX]" and that the system sales headwinds would continue into the second and third quarters of 2018. Analyst Craig Hallum noted that the earnings miss was attributable to "a lack of tenured reps, lighter than expected EMEA [Europe, the Middle East and

Africa] sales, and customers holding out for the upcoming implantation feature."

169.    Defendant Rhodes would again point to customer hesitancy on the July 30, 2018 conference call announcing financial results for the second quarter of 2018, stating:

> Overall, we benefited from positive seasonal trends in the second quarter versus first quarter and from a slightly larger and more tenured salesforce, although we continue to see customer hesitancy due to the anticipated availability of the ARTAS iX System with implantation functionality that was recently cleared by the FDA in March.

170.    In actuality, "customer hesitancy" was not a new trend that only developed during 2018, but had existed and was known by the Company prior to and at the time the IPO based on the very nature of ARTAS System sales, which had a typical sales cycle of 3 to 6 months, according to CW 3.

## DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT

### A.    Disclosure Obligations under the Securities Act and Regulation S-K

171.    "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor."); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

172.    To effectuate this purpose, a company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."); *see also* 15 U.S.C. § 77k(a).

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

173.   Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k. Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1-5).

174.   Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

175.   Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

i. Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

ii. Describe *any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income* from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed. 2017 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also S.E.C. Release No. 6835*, 1989 WL 211092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events

or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

176. Under these requirements, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." *S.E.C. Release No. 6835*, 1989 WL 1092885, at \*4 (May 18, 1989).

177. Accordingly, as the SEC has emphasized, the "specific provisions of Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at \*3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at \*3, \*17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at \*11 (December 19, 2003).

## B. Defendants Violated Their Disclosure Obligations in the Registration Statement

178. Defendants violated their disclosure obligations because the Registration Statement materially misrepresented and failed to adequately disclose the truth concerning: (i) the effectiveness of the Company's sales and marketing teams, including the PSMs who were relied upon to drive increased utilization through the provision of viable patient leads and marketing support; (ii) the quality of the ARTAS System and its ease of use, particularly the needle used to generate a high follicle harvest yield, lowering costs for the physician and purportedly making the system more economically valuable than alternatives; (iii) the total number of ARTAS Systems actually installed prior to and at the time of the IPO, as the Company's foreign distributors were engaging in widespread

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

1   warehousing of ARTAS Systems, meaning they were going uninstalled and failing to generate

2   procedure revenue; and (iv) the numerous adverse conditions and trends identified herein and existing

3   at the time of the Offering that would materially impact the Company's revenues going forward.

4   ## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

5   179.    Defendants are liable for any false and misleading forward-looking statements issued in

6   connection with the IPO.  The safe harbor provision of § 27A of the Securities Act, 17 U.S.C. § 77z-

7   2(b)(2)(D), specifically excludes those statements "made in connection with the initial public

8   offering," which includes all of the false and misleading statements made in connection with the IPO.

9   ## CLASS ACTION ALLEGATIONS

10  180.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

11  Procedure 23 on behalf of a class consisting of all persons and/or entities who purchased or otherwise

12  acquired the common stock of Restoration Robotics pursuant and/or traceable to the Company's false

13  and/or misleading Registration Statement issued in connection with the Company's IPO, and who

14  were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the

15  officers, directors, and affiliates of Defendants, and at all relevant times, members of their immediate

16  families, their legal representatives, heirs, successors or assigns, and any entity in which Defendants

17  have or had a controlling interest.

18  181.    The members of the Class are so numerous that joinder of all members is impracticable.

19  During the relevant time period, Restoration Robotics' securities were actively traded on the

20  NASDAQ Global Market under the symbol "HAIR."  While the exact number of Class members is

21  unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff

22  believes that there are hundreds of members in the proposed Class.  Record owners and other members

23  of the Class may be identified from records maintained by Restoration Robotics or its transfer agent

24  and may be notified of the pendency of this action by mail, using the form of notice similar to that

25  customarily used in securities class actions.

26  182.    Plaintiff's claims are typical of the claims of the members of the Class as all members

27  of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

28  complained of herein.

183.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

184.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and operations of Restoration Robotics;

(c)     whether certain defendants have a viable "due diligence" defense to the strict liability imposed by Section 11 of the Securities Act;

(d)     whether the Individual Defendants and Venture Capital Defendants are control persons of Restoration Robotics for purposes of Section 15 of the Exchange Act; and

(e)     to what extent members of the Class have sustained damages, and if so, the proper measure of damages.

185.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

**Violations of Section 11 of the Securities Act of 1933**
**Against Restoration Robotics, the Individual Defendants, and the Underwriter Defendants**

186.     Plaintiff incorporates each preceding paragraph by reference.

187.     This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S. C. § 77k, on behalf of Plaintiff and the Class, against Restoration Robotics, the Individual Defendants, and the Underwriter Defendants.

188.     The Registration Statement for the IPO was inaccurate and misleading, contained

untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

189.    The Company is the issuer of the securities purchased by Plaintiff and the Class.  As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

190.    The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.  As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

191.    The Underwriter Defendants each served as underwriters in connection with the Offering.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  These defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

192.    By reason of the conduct herein alleged, each defendant named herein violated Section 11 of the Securities Act.

193.    Plaintiff acquired Restoration Robotics common stock pursuant or traceable to the Registration Statement used for the IPO and without knowledge of the material omissions or misrepresentations alleged herein.

194.    Plaintiff and the Class have sustained damages, as the value of Restoration Robotics common stock has declined substantially subsequent to and due to Defendants' violations.

195.    This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

196.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from Defendants and each of them, jointly and severally.

## SECOND CAUSE OF ACTION

### For Violation of Section 15 of the Securities Act of 1933
### Against Restoration Robotics, the Management Defendants, and the Venture Capital Defendants

197.    Plaintiff incorporates each preceding paragraph by reference.

198.    This Cause of Action is brought pursuant to Section 15 of the Securities Act against Restoration Robotics, the Management Defendants, and the Venture Capital Defendants.

199.    The Management Defendants each were control persons of Restoration Robotics by virtue of their positions as directors and/or senior officers of Restoration Robotics.  Each of the Management Defendants had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of Restoration Robotics.

200.    The Venture Capital Defendants controlled the Company through their significant stock holdings and majority control over the Restoration Robotics Board, thus they each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document

contained all facts required to be stated therein. In the exercise of reasonable care, the Venture Capital Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Venture Capital Defendants are liable to Plaintiff and the Class.

201.    The Venture Capital Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of the Venture Capital Defendants' investment in Restoration Robotics.

202.    Restoration Robotics and the Management Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in the First Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action and certifying Plaintiff as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure and his counsel as Class counsel;

(B)    Awarding Plaintiff and the members of the Class damages, including interest;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

//

//

//

//

//

1    Dated: November 30, 2018                  **LEVI & KORSINSKY, LLP**

2                                              By: /s/ *Rosemary M. Rivas*
                                                   Rosemary M. Rivas
3                                                  44 Montgomery Street, Suite 650
                                                   San Francisco, CA 94104
4                                                  Telephone: (415) 291-2420
                                                   Facsimile: (415) 484-1294
5
                                                   Shannon L. Hopkins*
6                                                  Sebastiano Tornatore*
                                                   733 Summer Street, Suite 304
7                                                  Stamford, CT 06901
                                                   Telephone: (203) 992-4523
8                                                  Fax: (212) 363-7500

9                                                  * to be admitted *pro hac vice*

10                                                 Lead Counsel for the Class

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28