1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE<br><br>RESTORATION ROBOTICS, INC.<br>SECURITIES LITIGATION | Case No. 5:18-cv-03712-EJD<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION TO DISMISS; GRANTING<br>DEFENDANTS' JOINDER MOTIONS**<br><br>Re: Dkt. Nos. 45, 47, 49, 50 |

This class action arises out of Defendants' alleged violations of Section 11 and 15 of the Securities Act of 1933 ("the Act") during its initial public offering ("IPO") of Restoration Robotics, a company dedicated to robotic hair restoration.

Lead Plaintiff Edgardo Guerrini purchased Restoration Robotics common stock pursuant to the "Offering Materials," see *infra* I.A., issued in connection with Restoration's IPO.[1] Plaintiff alleges violations of Section 11 and 15 of the Act and argues that the Offering Materials contained materially false or misleading statements regarding Restoration's marketing function, the functionality of the ARTAS System (Restoration's hair transplant technology), and the ARTAS System's sales and continuing revenue. *See* Consolidated Amended Complaint ("Compl.") ¶¶ 3, 15, 19, 129, Dkt. 36. Plaintiff also claims Defendants violated Item 303 of SEC Regulation S-K by failing to disclose known trends or uncertainties that existed at the time of the IPO.

---

[1] Plaintiff does not allege a specific Class Period. *Cf.* Compl. ¶ 94 ("Prior to the Class Period . . . .").

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

United States District Court
Northern District of California

The Complaint names multiple defendants:[2] (1) Restoration Robotics; (2) Individual Defendants Ryan Rhodes (the Chief Executive Officer "CEO"), Charlotte Holland (Chief Financial Officer "CFO"), Frederic Moll (Chairman of the Board), Jeffrey Bird (Board member), Gil Kliman (Board member), Emmett Cunningham, Jr. (Board member), Craig Taylor (Board member), and Shelly Thunen (Board member); (3) Venture Capital Sutter Hill Ventures, L.P., Clarus Lifesciences II, L.P., Clarus Ventures II, LLC, Alloy Ventures 2002, L.P., Alloy Ventures 2005, L.P., Alloy Ventures 2002, LLC, Alloy Ventures 2005, LLC, Interwest Partners IV, L.P., and Interwest Management Partners IX, LLC; and (4) Underwriter Defendants National Securities Corporation, Roth Capital Partners, LLC, and Craig-Hallum Capital Group LLC. *Id.* ¶¶ 21–43.[3]

## I.    BACKGROUND

### A. Factual Background

***Company Overview.***  Restoration Robotics is a medical technology company that "develop[s] and commercializ[es] a robotic device, the ARTAS System that assists physicians in performing many of the repetitive tasks that are part of a follicular unit extraction surgery, a type of hair restoration procedure." Compl. ¶ 51, Dkt. 36.  The ARTAS System is an all-in-one device comprised of a patient chair, a robotic arm, an integrated vision system, artificial intelligence algorithms, and a series of proprietary end effectors, which have a needle and punch to secure hair follicles from a patient's scalp. *Id.* ¶ 52.  It is designed to "robotically assist[] a physician through many of the most challenging steps of the hair restoration process." *Id.* ¶ 54.

In April 2011, Restoration received clearance to market and sell the ARTAS system in 61 countries. *Id.* ¶ 56.  To sell the system domestically, Restoration relies on a direct sales and

---

[2] For clarity, this Court refers to Defendant Restoration Robotics as "Restoration."  Other Defendants are referred to by name or as part of their collective group, *i.e.*, "Individual Defendants."

[3] Section 11 allows a cause of action against every person who: (1) signed the registration statement; (2) was a director of the company; (3) helped prepare the statement; or (4) was an underwriter. 15 U.S.C. § 77k(a)(1–5).  Defendants do not contest that this governs them and so this Court does not address any arguments that certain defendants are improperly joined.

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

2

marketing team. This team is composed of Regional Sales Managers ("RSMs"), Clinical Trial Managers ("CTMs"), and Practice Success Managers ("PSMs"). *Id.* ¶ 66. RSMs are "responsible for coordinating with executing the direct sales of the ARTAS Systems." *Id.* ¶ 67. CTMs provide "high quality, comprehensive training and education to physicians on the use of the ARTAS System and on how to build their hair restoration practices." *Id.* ¶ 68. PSMs work alongside physician clients to help "build awareness and market the ARTAS procedure and increase ARTAS brand-awareness." *Id.* ¶ 69. This system is meant to prioritize profits by working collaboratively with physician customers to increase the number of ARTAS procedures performed. *Id.* ¶ 73. Internationally, the Company sells the ARTAS System to independent, third-party distributors who then sell the systems to end-users. *Id.* ¶¶ 118–19. As an inducement to buy the system, Restoration promised doctors high quality patient leads. *Id.* 78–80.

   ***Revenue Structure.*** Restoration generates revenue from the ARTAS system in three ways: (1) systems, (2) procedure based, and (3) service-related fees. *Id.* ¶ 59.

   First, "systems" is the sale of the actual ARTAS system, which is a one-time revenue at an average price of $225,000 to $240,000. *Id.* ¶ 61. Domestic sale revenue is recorded upon delivery to customers. Declaration of Gavin M. Masuda in Support of Restoration Robotics Defendants' Motion to Dismiss ("Masuda Decl."), Ex. A at 61, Dkt. 48. International sale revenue is recorded upon shipment to an international distributor. *Id.* Second, "procedure based" revenue is earned anytime there is a procedure; physician-customers must "pay in advance on a per-follicle basis for the follicles to be harvested, and on a per procedure basis for Site Making." Compl. ¶ 62. Outside of the United States, physician-customers pay in advance on a per procedure basis for both follicle extraction and site making. *Id.* Third, Restoration generates "service-related fees" from post-warranty maintenance on the ARTAS Systems pursuant to "service and support contracts offered by the Company." *Id.* ¶ 64. Because the purchase of an ARTAS System is a one-time occurrence, Restoration depended mainly on "procedure-based" revenue. *Id.* ¶ 59.

   Internationally, the revenue system functioned a bit differently. Plaintiff alleges that, at the

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

3

end of the quarter, Restoration increased sales to foreign distributors to boost quarterly sales numbers. *Id.* ¶¶ 118–23. In these foreign sales, the products did not go directly to the physician-consumer; instead, a distributor purchased the system and then allowed it to lay dormant in their warehouses. *Id.* This resulted in "warehousing," which resulted in limited "procedure based" profits and oversaturated foreign markets, ultimately causing "system" revenue to decrease. *Id.* ¶¶ 145–58. In response, Restoration announced a pivot to a U.S.-centric model in May 2018. *Id.* ¶ 161.

**Pre-IPO.** Plaintiff uses three confidential witnesses ("CWs") to support its allegations. *Id.* ¶ 44. CW 1 was a PSM, employed by Restoration before the IPO. *Id.* ¶ 45. CW 2 was a PSM employed after the IPO. *Id.* ¶ 48. And, CW 3 was an RSM employed before and after the IPO. *Id.* ¶ 49. According to CW 1 and 2, Restoration was unable to provide doctors with the promised patient leads and marketing support. *Id.* ¶¶ 80–82. Those that Restoration did identify as potential leads often had "no idea" how they ended up on Restoration's list. *Id.* ¶ 82. This problem was so widespread, it resulted in a number of internal complaints among the PSMs and physicians. *Id.* Ultimately, because patient leads were not provided, physicians allowed their ARTAS System to lay dormant, resulting in a significant drop in procedure-based revenue. *Id.* ¶¶ 85, 93.

Beyond the lack of patient leads, doctors also reported discontent with the amount of time and expense required to use the ARTAS System. *Id.* ¶¶ 97–99. Allegedly, the system had widespread product issues that resulted in lower follicle yields, which further caused doctors to abandon the system. *Id.* Specifically, the needles used for the procedure suffered from a material defect that caused the machine to damage a patient's already limited number of donor grafts, lowering harvest yields and increasing costs to physicians, leading to more abandonment of the system. *Id.* ¶ 140. According to CW 1, thirteen percent of doctors in her region had abandoned the system. *Id.* ¶ 100.

Finally, before the IPO, device sales stalled because interested doctors were waiting for the new product (the ARTAS iX). *Id.* ¶¶ 112, 152. Representatives were told to avoid mentioning

this during sales for fear of stagnation of sales.  *Id.* ¶ 167, 169.  Sales of the original ARTAS System were slowing because of this potential new product—doctors did not want to buy an out-of-date system.  *Id.*

**The IPO.**  On September 1, 2017, Restoration filed its Registration Statement with the Securities and Exchange Commission ("SEC").  *Id.* ¶ 5.  After several amendments, the statement became effective on October 11, 2017.  *Id.* ¶ 6.  On October 13, 2017, Restoration filed a Prospectus pursuant to Rule 424(b)(4) with the SEC, commencing the public offering of 3,575,000 Restoration shares of common stock priced at $7.00 per share, raising over $23 million in net proceeds.  *Id.* ¶ 128.  The Registration Statement and the Prospectus, together the "Offering Materials," form the basis of this action.  *Id.* ¶ 7.  The Offering Materials contained disclosures regarding Restoration's sales and marketing strategy, the quality and design of the ARTAS System, and ARTAS system sales and continuing revenue.  *Id.* ¶¶ 130–46.

**Post-IPO.**  Following the IPO, the Company's stock traded consistently below its offering price of $7.00 per share.  *Id.* ¶ 13.  Plaintiff identifies three significant events: first, on January 5, 2018, Restoration announced Chris Aronson was replacing long-time Vice President of Global Sales Brent Nixon, causing the stock price to drop 14%.  *Id.* ¶¶ 163–64.  Second, on May 14, 2018, Restoration announced its first quarter earnings for 2018, which showed a loss and caused the share price to drop 14.42% (falling to $3.68 per share).  *Id.* ¶¶ 150–51.  Third, on November 5, 2018, Restoration announced quarterly earnings for the third quarter of 2018 of $4.8 million, based on the sale of 11 ARTAS iX Systems.  Despite an increase in total system sales, procedure-based revenue dropped to $1.28 million.  *Id.* ¶ 152.  Analyst Roth Capital Partners, and other analysts, lowered their price target to $4 per share.  *Id.* ¶ 153.  The share price decreased to $1.13 per share as of November 29, 2018.  *Id.*

### B.  Alleged Material Misstatements/Omissions

Plaintiff alleges the Offering Materials contained 10 materially false, misleading, and incomplete statements concerning the Company's marketing function, the quality and design of

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

5

the ARTAS System, and the number of ARTAS Systems installed and their prospects for revenue generation. *Id.* ¶¶ 130–47. For clarity, the Court has numbered Plaintiff's alleged actionable statements. Bold and italics are copied from Plaintiff's Complaint and indicate the part of the statement alleged to be materially false and misleading.

### *Statements Concerning Restoration's Marketing Function*

#### *Statement 1*

We strategically market the ARTAS System to hair restoration surgeons, dermatologists, plastic surgeons and aesthetic physicians. We believe we are able to reach our target physician customers effectively through focused marketing efforts. These efforts include participation in trade shows, scientific meetings, educational symposiums, webinars and other activities. ***For physicians who purchase the ARTAS System, we provide comprehensive clinical training, practice-based marketing support, as well as patient leads. For example, we believe we help our physician customers increase the number of procedures performed by assigning a practice success manager, or PSM, to provide assistance in building the physician-customer's hair restoration practice.*** Support from a PSM includes the deployment of patient marketing materials, assisting with social media and digital marketing strategies, and other marketing and sales support.

Compl. ¶ 131.

#### *Statement 2*

***Drive increased utilization of the ARTAS System by working collaboratively with our physician customers to increase the number of ARTAS procedures that are performed.***

Compl. ¶ 132.

#### *Statement 3*

*Drive Increased Utilization.* In addition to revenues from system sales and servicing, we also generate revenue from procedure based fees. We will continue to work collaboratively with our physician customers to increase utilization by introducing new functionalities, technology and innovations. ***In addition, we believe we can increase procedure revenues by helping physicians build their practice through our marketing and training support. To achieve all of these goals, we intend to utilize our teams of clinical training managers, or CTMs, PSMs and field service engineers to work with and to support our physician customers in developing profitable ARTAS practices.***

Compl. ¶ 133.

#### *Statement 4*

Practice Success Managers

Our PSMs are responsible for helping our physician customers build awareness and market the ARTAS procedure and increase ARTAS brand-awareness. Our PSMs average over ten years of

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

6

experience in developing hair restoration practices and aesthetics practices. ***They form strong relationships with our customers and consult on how to integrate the ARTAS System into their practices, while raising awareness of the procedure among potential patients.*** This process often begins before the ARTAS System is installed at the customer site. ***Our PSMs work closely with the team that will manage the ARTAS business at the practice level to establish goals and develop detailed strategies to achieve these goals. This includes extensive training and coaching with respect to the patient consultation process. We provide easily implemented marketing tools allowing practices to create individually tailored website content, direct mail advertisements, print ads for magazines and newspapers and brochures.*** In addition, PSMs consult on methods to raise awareness of the ARTAS procedure through practice events, public relations, television, and radio advertising and other channels.

Compl. ¶ 134.

***Statement 5***

***We sell the ARTAS System, provide service and generate procedure based revenue by helping our physician customers build their hair restoration practice, through a direct sales force in the U.S.*** which, as of May 31, 2017, included seven regional sales managers, or RSMs, seven CTMs, and seven PSMs.

Compl. ¶ 135.

### Statements Concerning the Quality and Design of the ARTAS System

***Statement 6***

The ARTAS System's image-guided robotic capabilities allow ***physicians to perform hair restoration procedures with fewer staff required than a traditional strip surgery or a manual FUE procedure.*** Procedures can also be performed with less physician and technician fatigue.

Compl. ¶ 138.

***Statement 7***

The needle travels at approximately 2,500 mm to 3,000 mm per second when it contacts the skin. ***This provides targeted precision and a cleanly scored incision.***

Compl. ¶ 140.

***Statement 8***

The punch then spins at 3,000 rpm and loosens the grafts from the surrounding tissue. In a clinical setting, we have observed that the dissection cycle takes between one to two seconds per graft, depending on the length of the graft. In a clinical setting, the ARTAS System has been shown to move from graft to graft at a rate of approximately one to three seconds, thereby enabling the ARTAS System to dissect a graft every two to five seconds, or approximately 720 to over 1,800 grafts per hour. The ARTAS System enables the physicians to adjust dissection parameters to accommodate for different types of skin, and manipulate graft selection algorithms based on patient needs. ***The ARTAS System can be programmed to dissect as many grafts as appropriate thus maximizing the use of the donor area. It can also be programmed to dissect grafts with more than two hairs each, thereby increasing the hair yield or the number of hairs per graft.***

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

7

*Id.*

**<u>Statements Concerning the Number of ARTAS Systems Installed & Revenue Generation</u>**

***Statement 9***

Historically, the majority of our revenue and our revenue growth has been generated through system sales. While we would expect our procedure based fees to continue to increase as our installed base of ARTAS Systems grows worldwide, the total number of procedures has not increased proportionally with the increase in our installed base and the number of procedures performed tends to vary from quarter-to-quarter. During the twelve months ended December 31, 2016, we sold 32 ARTAS Systems and, during the six months ended June 30, 2017, we sold 27 additional systems ***representing an aggregate installed base growth of approximately 34% from December 31, 2015, or 174 to 233 systems***, yet our procedure based fee for the six months ended June 30, 2017 increased by approximately 10%, or $0.3 million, from the six months ended June 30, 2016.

Compl. ¶ 144.

***Statement 10***

***We believe that revenue from procedure based fees has not grown proportionally with the increase in our installed base and varies from quarter-to-quarter due to a number factors, including:***

- physician uptake causing a slow ramp-up to utilizing the ARTAS System, which is particularly evident with physicians who are new to hair restoration procedures or physicians who do not operate a solely hair restoration focused practice who are commonly the profile we are targeting;

- capacity limitations with the current installed base of ARTAS Systems, which can result in procedure based fees not growing as quickly as system sales, as high performing practitioners are limited in the number of procedures that can be performed in any given period;

- ***limited or no utilization of the ARTAS System after purchase as a result of a change in physician preference or practice***

- the concentration of ARTAS procedures being performed on a limited number of ARTAS Systems leading to volatility between periods if particular high volume practitioners perform a smaller number of procedures in a given period which often happens during the summer period; and

- the number of procedures performed vary from quarter-to-quarter as the hair restoration industry is characterized by seasonally lower demand during the summer period when both physicians and prospective patients take vacations.

Compl. ¶ 146.

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

8

### C. Procedural Background

Following the continued stock decline, multiple lawsuits were filed against Defendants. One of these—*Edgardo Guerrini v. Restoration et al.*—was randomly assigned to this Court. *See* Complaint for Violations of Federal Securities Laws, Dkt. 1. This Court consolidated this case with other related ones. *See* Order Granting Consolidation, Dkt. 32. On November 30, 2018, Plaintiff filed a Consolidated Amended Complaint, which is the subject of Restoration and Individual Defendants' current motion to dismiss pursuant to Rule 12(b)(6). Restoration Robotics Defendants' Motion to Dismiss ("Mot."), Dkt. 47. Defendants also request judicial notice regarding facts pertaining to their motion to dismiss. *See* Request for Judicial Notice re Motion to Dismiss ("Req. Jud. Not."), Dkt. 49. Finally, both the Underwriter and Venture Capital Defendants seek to join this motion to dismiss. *See* Motion for Joinder of Underwriter Defendants, Dkt. 45; Motion for Joinder of Venture Capital Defendants, Dkt. 50.

## II. JUDICIAL NOTICE

Defendants ask this Court to take judicial notice of Exhibit A, which is attached to the declaration of Gavin M. Masuda (the "Masuda Decl."). Req. Jud. Not. At 1.

### A. Legal Standard

Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *see also* Fed. R. Civ. P. 12(d). This rule does not apply to the incorporation by reference doctrine or judicial notice under Federal Rule of Evidence 201. *Khoja*, 899 F.3d at 998.

Rule 201 permits a court to take judicial notice of an adjudicative fact "not subject to reasonable dispute," that is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Incorporation by reference treats certain documents as though they are part of the complaint itself. *Daniels-Hall*,

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

629 F.3d at 998. These are situations where the complaint "necessarily relies" upon a document or where the complaint alleges the contents of the document and the documents authenticity and relevance is not disputed. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). A defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002.

### B. Discussion

Plaintiff does not object to the judicial notice of Exhibit A, which is Restoration's Prospectus that was filed with the SEC on October 13, 2017. This is a publicly available document; thus, it is subject to judicial notice. *In re Extreme Networks, Inc. S'holder Deriv. Litig.*, 573 F. Supp. 2d 1228, 1231 n.2 (N.D. Cal. 2008) ("Public records, such as SEC filings, are properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss in a securities case."). Further, Plaintiff explicitly and repeatedly refers to the Prospectus in his Complaint. *See* Compl. ¶¶ 2 n.2, 7, 63, 65, 67–71, 77, 112–14, 131–33. Therefore, Exhibit A is also incorporated by reference. Accordingly, this Court **GRANTS** Defendant's request for judicial notice.

### III. JOINDER

The Underwriter and Venture Capital Defendants seek to join Restoration and Individual Defendants' motion to dismiss. Plaintiff does not oppose these joinder motions. This Court **GRANTS** these joinder motions.

### IV. MOTION TO DISMISS[4]

Plaintiff alleges Defendants violated Section 11 and 15 of the Act. Plaintiff also contends that Defendants violated Item 303. Compl. ¶¶ 173–74. The Court addresses these allegations in

---

[4] This Court disagrees with Defendants' contention that Plaintiff's Complaint was pled in "true puzzle style." Mot. at 11. To the contrary, the Court found Plaintiff's complaint to be clear and devoid of "long, rambling passages" without "specific reasons for the statements falsity." *Strassman v. Fresh Choice, Inc.*, 1995 WL 743728, at *4 (N.D. Cal. Dec. 7, 1995).

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

10

turn.

In assessing a Rule 12(b)(6) motion to dismiss, courts consider the complaint in its entirety, "accept all factual all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing Federal Rule of Civil Procedure 8(a)(2)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The requirement that the court must "accept as true" all allegations in the complaint is "inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**A. Section 11 Claim**

**1. Legal Standard**

To allege a claim under Section 11, a plaintiff must prove "'(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'" *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (noting that fact is material when "a *reasonable* investor would [view] the nondisclosed information as having *significantly* altered the total mix of information made available" (citation and quotation marks omitted)). Section 11 creates a private cause of action in favor of securities purchasers who rely upon a materially false or misleading prospectus. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1412 (9th Cir. 1994) (citing 15 U.S.C. § 77k(a)). "No scienter is required for liability under § 11; defendants will be liable for

innocent or negligent material misstatements or omissions."[5]  *In re Daou*, 411 F.3d at 1027.

For a misstatement to be actionable, the statement must be both false and material.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  To survive a motion to dismiss, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  *Metzler Inv. GmbH*, 540 F. 3d 1049, 1070 (9th Cir. 2008).  Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Silence, absent a duty to disclose, "is not misleading under Rule 10b-5."  *Basic*, 485 U.S. at 239 n.17; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (treating 10(b)(5) and Section 11 claims the same as to their applicability to "untrue statement[s] of fact").  "Often a statement will not mislead even if it is incomplete or does not include all relevant facts."  *Brody*, 280 F.3d at 1006.

Not all material adverse events must be disclosed to investors.  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) (discussing *Matrixx*, 563 U.S. at 38–45).  Consequently, omissions are actionable only if a defendant has a duty to disclose information and fails to do so.  *Basic*, 485 U.S. at 239 n.17.  Hence, if the omission does not "make the actual statement[] misleading," a company need not supplement the statement "even if investors would consider the omitted information significant."  *Rigel*, 697 F.3d at 880 n.8.

Finally, an actionable statement must also "be capable of objective verification."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).  For example, business puffery or opinion (vague, optimistic statements) are not actionable because they do not "induce the reliance of a reasonable investor."  *Or. Pub. Emps.*

---

[5] The parties agree that this motion to dismiss is governed by Rule 8(a)(2).  *See* Restoration Robotics Defendants' Reply ("Reply") at 1, Dkt. 55.  While Section 11 does not contain an element of fraud, a plaintiff may be subject to Rule 9(b)'s particularity requirement if the complaint "sounds in fraud."  *In re Daou*, 411 F.3d at 1027.  Here, the Complaint expressly "disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct."  Compl. ¶ 1.  Accordingly, Rule 8(a)(2) applies.

*Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

### 2. Discussion

In their Motion to Dismiss, Defendants challenge the sufficiency of Plaintiff's Section 11 claim by arguing that the offering materials, which form the complaint, were not false or misleading. Mot. at 11. The alleged material misstatements or omissions can be separated into three categories: statements concerning Restoration's marketing function, statements concerning the quality and design of the ARTAS system, and statements concerning ARTAS systems' "installed base." In order to effectively address these categories of statements, the Court sorts the statements into headings based on Defendants arguments for dismissal, *i.e.*, (1) General Statements of Corporate Optimism and (2) Falsity (including the alleged omissions).[6]

### i. General Statements of Corporate Optimism

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *In re Fusion-io*, 2015 WL 661869, at *14 (collecting cases). When valuing corporations, investors do not "rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "Puffing" concerns expressions of opinion, as opposed to knowingly false statements of fact. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606. Statements that are capable of "objective verification" are not "puffery" and can constitute material misrepresentations. *Id.*

**Statement 1.** This statement is inherently subjective "puffing" and would not induce reliance of a reasonable investor. *See* Reply at 5. Defendants stated they "provide *comprehensive* clinical training, practice-based marketing support, as well as patient leads" to customers and

---

[6] The Court does not address the "bespeaks caution" arguments because it was unnecessary to do so. This should not be construed, however, as rejecting or accepting the applicability of this argument.

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

13

"*believe* [they] help [their] physician customers increase the number of procedures performed by assigning a practice success manager."[7] Compl. ¶ 131 (emphasis added). The Ninth Circuit held a similar statement inactionable puffery. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606 (holding "[w]e *believe* that our track record for enrollment and revenue growth is attributable to our offering *comprehensive* services combining quality educational content, teaching resources and customer service with formats that are accessible and easy to use for students as well as our corporate clients" inactionable (alteration in original) (second emphasis added)). Here, as there, generic phrases like "believe" and "comprehensive" are too vague to be actionable. *Id.* Moreover, terms like "patient leads," "marketing support" and "increase procedures" are too generic to be actionable. *Id.* (concluding terms like "educational content" and "teaching resources" provided "nothing concrete upon which [the Plaintiffs] could rely" (alteration in original)).

**Statement 2.** This statement addresses Defendants' goals for the ARTAS System. Plaintiff pleads only a phrase of the statement and omits the prefatory language, which states: "Our *goal* is to expand the commercialization of the ARTAS System . . . [by] driv[ing] increased utilization of the ARTAS System by working collaboratively with our physician customers." Masuda Decl., Ex. A, at ECF 11 (emphasis added). Investors neither rely on phrases like "goal" nor "increased utilization"—these are too vague and constitute "non-actionable puffing." *See, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) (holding "[w]e are confident the improved features for Orthos [orthodontists] and GPS will *increase* and sustain *utilization*" to be "feel good" statements on which investors do not rely when valuing corporations (emphasis added)); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y. 2009) ("Statements of '*hope*, opinion, or belief about [the company's] future performance' are not actionable." (citation omitted)). "Hope" is a synonym of "goal." Both refer to vague aspirations for the future and investors "know how to devalue the optimism of corporate executives." *In re*

---

[7] Moreover, there is no allegation Defendants did *not* believe this.

*Cutera*, 610 F.3d at 1111.

**Statement 3.** Much like Statement 1, Statement 3 pertains to Defendants' belief in increasing ARTAS's profitability and its intention to develop the ARTAS system. Compl. ¶ 133 ("[W]e *believe*[8] we can increase procedure revenues . . . . [W]e *intend* to utilize our teams . . . to work with and to support our physician customers in developing profitable ARTAS systems."). Such forward-looking statements are non-actionable. *See Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606. An "intention" to do something is forward-looking and thus non-actionable. *See Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 176 (D.R.I. 2003) (holding statements in Prospectus "[w]e intend to become . . . ." "precisely [the] type of exempt 'forward-looking'" statements).

The cases cited by Plaintiff to show that Statements 1–3 are actionable are inapposite; they deal with situations where the defendants made reassuring statements in response to direct questions from investors. Plaintiff's Opposition to the Motion to Dismiss ("Opp."), Dkt. 53 at 24. For instance, in *Azar v. Yelp, Inc.*, "Defendants *assured* investors that 'the fundamentals are all in place and really strong' in the context of *responding to a specific question* about the local advertising program that Defendants allegedly knew was performing poorly." 2018 WL 6182756, at *12 (N.D. Cal. Nov. 27, 2018) (emphasis added). Likewise, in *In re Signet Jewelers Limited Securities Litigation*, the defendants' made the statements "in response to *direct questions* about Signet's credit portfolio." 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (emphasis added). Thus, the courts could not conclude (on a motion to dismiss) that the statements were so vague a reasonable investor would not reasonably rely on them because they were made in response to investor queries and addressed "specific aspects" of the company's health. 2018 WL 6182756, at *12. In contrast, here, Statements 1–3 were not made in response to investors; they were made in the Offering Materials and generally discussed Restoration's marketing strategy. Compl. ¶ 130.

---

[8] Defendants argue that "belief" applies to Statement 4 as well. Mot. at 5. This Court disagrees. Nowhere before the phrase "easily implemented" is a vague, optimistic statement of belief. Accordingly, Statement 4 does not fit within the corporate optimism exception.

Plaintiff further argues the statements are actionable because they omit material facts known to the Defendants. Opp. at 25, Dkt. 53 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015) ("And the purpose of § 11 supports this understand of how the omissions clause maps onto opinion statements. Congress adopted § 11 to ensure that issuers 'tell[] the whole truth' to investors." (citation omitted)). Plaintiff contends that Defendants falsely represented that the Company's sales would help Restoration's physician customers increase the number of procedures performed, despite knowing: "(1) the Company was unable to provide its customers with patient leads (¶ 82); (2) the Company's marketing initiatives were ineffective (¶¶ 82–93); and (3) the design of the geographical regions to which a PSM was assigned were illogical and hindered practice growth (¶ 84)." Opp. at 25.

Plaintiff is correct that prefatory language like "we think" or "we believe," does not alone absolve securities fraud liability because these phrases can preface statements capable of misleading investors. Opp. at 25. Plaintiff, however, is incorrect the undisclosed "facts" listed above render Defendants' statements misleading. To the contrary, Defendants *did* provide "full and fair" disclosure of material information. *Id.* The Prospectus explicitly identifies Statements 1–3 as "forward-looking statements" and informs investors that they "may turn out to be inaccurate." Masuda Decl., Ex A at 50. These cautionary phrases are repeated throughout. *See, e.g.*, *id.* at 5, 8, 12. Indeed, just after Statement 2 is a disclosure entitled "Risks Associated with Our Business." *Id.* at 5. In it, Defendants note they have had "limited commercial history and have incurred significant losses since our inception. We *anticipate that we will continue to incur losses for the foreseeable future*, which, together with our limited operating history, makes it difficult to assess our future viability." *Id.* (emphasis added). Thus, unlike *In re Allied Nevada Gold Corp. Securities Litigation*, a case Plaintiff cites as support, Defendants did not mislead investors as to the status of their financial viability. *Compare* 743 F. App'x 887, 888 (9th Cir. 2018) (holding "forward-looking" optimistic statements actionable because Defendants made them knowing they were false *and* omitted cautionary language about the potential risk), *with*

Masuda Decl., Ex. A at 12 (discussing Restoration's limited financial commercial history and urging investors to "consider investing in [the] common stock" because of the significant risks facing Restoration).

Accordingly, given the abundance of cautionary language and honest disclosure regarding Defendants' lack of commercial success, Statements 1–3 were not "half-truths." *Cf. Omnicare*, 135 S. Ct. at 1330 ("[A]n investor reads each statement within such a document . . . *in light of all its surrounding text . . . .* So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."); Mot. at 16.

For these reasons, the Court holds that Statements 1–3 are nonactionable statements. Accordingly, this Court **GRANTS** Defendants' motion to dismiss as to these claims.

### ii.        Material Misrepresentation or Omission

The standard for Section 11 falsity is more lenient than pleading a Rule 10(b)(5) violation. *See In re Countryside Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1156 (C.D. Cal. 2008) (noting that securities plaintiffs alleging fraud must meet "three separate pleading standards"). When a Section 11 complaint does not "sound in fraud," it must only meet Rule 8(a)'s ordinary notice pleading requirements. *Id.* at 1162. Even without Rule 9(b), however, Plaintiff must still plead enough facts to state a facially plausible claim for relief under Section 11 and Section 15. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In a Section 11 context, this means Plaintiff must allege sufficient facts from which this Court can infer "a statement was either false or misleading (in light of omitted information), and that [the] same statement was material." *In re IAC/InterActiveCorp. Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010). Materiality is "fact-specific;" it "turns on context." *Id.* Statements in a Prospectus, thus, must "be read in the context of the whole document" and "judged based on 'the facts as they existed when the applicable registration statement became effective.'" *Id.* (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009)). Accordingly, the issue is not whether the

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

17

statements, taken separately, were "literally true." *Id.* The issue is whether defendants' statements "taken and in context, would have mislead a reasonable investor about the nature of the [investment]." *Id.* (alteration in original).

**Statement 1, 4, and 5.**[9] Plaintiff argues Statement 1,[10] 4, and 5 are misleading because, despite Defendants' representations that PSMs formed "strong relationships" with customers, provided "extensive training and coaching," and provided "easily implemented marketing tools:"

- "Restoration was not providing clinical training and marketing support to customers. Rather, sales personnel were geographically dispersed making it impossible to properly service doctors."

- "Restoration was using antiquated methods of obtaining patient leads . . . . [and thus] PSMs were unable to provide patient leads to customers and the majority of leads the Company supposedly providing had never even heard of the Company."

- "The assignment of a PSM did not correlate with an increased number of procedures by physicians" because "PSMs were often unequipped to actually help a new doctor get her practice off the ground" and thus the doctors did not receive the promised "marketing efforts."

Compl. ¶ 136.

First, as to Statement 5, the Court is confused as to why this statement is alleged to be misleading. The Complaint alleges Defendants *did* sell the ARTAS system, provide services, and generate procedure-based revenue. *See id.* ¶ 150 (discussing sale of ARTAS Systems). To the extent the statement is false pursuant to the three allegations outlined, the argument is rejected for the reasons below.

The first allegation can be easily dismissed: Plaintiff repeatedly admits the Company *was*

_____

[9] The Court addresses these Statements together because Plaintiff provides the same allegations of falsehood for them. *See* Compl. ¶ 136.

[10] Above, the Court concluded Statement 1 is inactionable corporate puffery. The Court analyzes here why the discussion of "patient leads" was not false.

providing clinical training and marketing support to customers.  *See, e.g.*, ¶¶ 82–83 (discussing patient leads provided and taking issue not with the *lack* of marketing capabilities, but the *form* of marketing).  The mere existence of the confidential witnesses informs the Court that customers were supported.  Hence, Plaintiff's argument essentially crumbles into an efficacy, but not a falsity, argument.  Mot. at 12.  Plaintiff takes issue with the methods used by Defendants and grounds their argument in what would have ben "proper" to service doctors.  Compl. ¶ 136.  This is not the standard—it is Plaintiff's burden to show falsity, not inadequacy.

Next, Plaintiff takes issue with Defendants' "antiquated marketing tools."  *Id.*  As described by CW 1, far from having "widespread digital marketing capabilities," the Company relied on traditional methods of marketing and advertising like brochures, pamphlets, and lobby posters, which did not generate patient leads off the street.  *Id.* ¶ 83.  Defendants, however, do not allege in the Prospectus to have "widespread digital marketing capabilities."  To the contrary, they state they have "digital marketing strategies," but do not state they are "widespread" or advanced.  *See* Masuda Decl., Ex. A at 80.  Indeed, in Statement 4, the marketing tools stated *are* mainly non-digital.  Compl. ¶ 134.  Thus, again, Plaintiff's main contention is with the form, not the substance, of the marketing strategies discussed in Statement 4.

Plaintiff finally argues that Defendants provided inadequate marketing support because they failed to deliver "patient leads" as promised.  *See* Compl. ¶¶ 131, 136.  This claim is based on CW 1's statement that she only received "one actual patient customer *in her territory*."  *Id.* ¶ 82 (emphasis added).  Plaintiff alleges the other patient leads were "false sign ups," who had been "'signed up' for restoration services and had 'no idea' about the Company," and that this was a widespread problem.  *Id.*  The main issue with this statement is that Defendant's made *no* representations as to the quality or quantity of leads.  Masuda Decl., Ex. A at 80.  To the contrary, Defendant's stated throughout the Prospectus that their marketing strategy may fail because existing management and personnel "may not be adequate to support our future growth."  *Id.* at 28; *Id.* at 5 (discussing limited commercial history and incursion of significant loss); *Id.* at 7

(discussing risk of investing with Restoration); *see also In re IAC*, 695 F. Supp. 2d at 117 (noting court must view prospectus as a whole to determine if an investor would have been misled about the nature of the investment). Plaintiff may not now, with the benefit of hindsight, point to the inadequacy of the patient leads. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1419 ("Plaintiffs cannot use the benefit of 20–20 hindsight to turn management's business judgment into securities fraud.").

For these reasons, the Court holds that Plaintiff failed to plead falsity for Statements 1, 4, and 5. Accordingly, this Court **GRANTS** Defendants' motion to dismiss as to these statements.

**Statement 6.** Plaintiff alleges the statement that the ARTAS System "allow[s] physicians to perform hair restoration procedures with fewer staff than" non-ARTAS procedures was false or misleading because the number of personnel was "functionally equivalent" for both types of procedures. Compl. ¶ 138–39. Traditional hair-restoration procedures require a team of "between four and eight technicians." *Id.* ¶ 139; Masuda Decl., Ex. A at 83. An ARTAS procedure, requires "at least four additional technicians to assist, rendering the manpower necessary to perform this procedure functionally equivalent to the others mentioned in the Offering Materials." *Id.* ¶ 139. However, as Defendants point out, four is plainly "fewer" than eight, meaning the procedure *does* require less staff. Mot. at 17. Even if physicians chose to bring more personnel into the surgery, it does not render the statement false that they *could* have fewer personnel. Thus, this statement has not been shown to be false. *See* Reply at 8 (noting that Plaintiff does not oppose this and thus concedes it); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1131 (N.D. Cal. 2008) ("Plaintiffs' opposition does not address this claim or defendants' arguments, and thus the Court concludes that plaintiffs have abandoned this claim. The Court GRANTS defendants' motion to dismiss this claim without leave to amend.").

For these reasons, the Court holds that Plaintiff failed to plead falsity for Statement 6. Accordingly, this Court **GRANTS** Defendants' motion to dismiss as to this statement without leave to amend.

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

20

**Statement 7.** Plaintiff challenges statements describing the performance of the ARTAS System's needle as false or misleading because the needle did not "provide[] targeted precision and a cleanly scored incision." Compl. ¶¶ 140–41. CW 1 alleges the needles were actually "faulty" and "damaged the hair grafts." *Id.* ¶¶ 96–97.

First, there are adequate facts from which this Court can infer the needle did *not* provide targeted precision or a cleanly scored incision. *See id.*; *see also In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *13 (S.D. Cal. Sept. 27, 2016) (finding that inference that CWs credible where their title and job descriptions were identified was stronger than inference they were disgruntled, low-level employees making unsubstantiated statements). Because Rule 8(a)(2)'s plausibility standard applies, this Court must draw inference in Plaintiff's favor. The stronger inference here is that CW 1, someone pled to have been employed during the relevant time period with job duties, has adequate knowledge of the needles and is telling the truth. This outweighs the inference that CW 1 is making unsubstantiated statements. Mot. at 25. Indeed, the Court must infer that if CW 1 was having this experience with the needles, other PSMs and physicians were as well. *Cf.* Mot. at 17 (arguing CW 1 does not testify as to experience of all ARTAS users); *In re Bofi Holding*, 2016 WL 5390533, at *13.

Defendants argue that the statement is not misleading because there was an explicit risk disclosure pertaining to the needle. The Prospectus, however, advises that patients could experience "adverse treatment" if the system was used improperly. Masuda Decl., Ex. A at 23, 88. The functionality of the needle itself has little to do with the ARTAS System being used improperly.

Finally, there is no requirement that Defendants know the statement about the needles was false when made. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983) ("Liability against the issuer of a security is virtually absolute [under Section 11], even for innocent misstatements."); *but see* Opp. at 21 ("Plaintiff's well-pleaded allegations that the defective needle issues existed '[p]rior to the Class Period, and continuing through today' (¶94) . . . .").

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

21

1    For these reasons, the Court holds that Plaintiff plead falsity for Statement 7. Accordingly,

2    this Court **DENIES** Defendants' motion to dismiss as to this statement.

3    **Statement 8.** This statement alleges "[t]he ARTAS System can be programmed to dissect

4    as many grafts as appropriate thus maximizing the use of the donor areas. It can also be

5    programmed to dissect grafts with more than two hairs each, thereby increasing the hair yield or

6    the number of hairs per graft. Compl. ¶ 140. Plaintiff alleges this was materially misleading

7    because the machine "actually suffered from a defect that would cause [it] to damage the donor

8    graft, lowering harvest yield." Compl. ¶¶ 140, 141.

9    The statements of performance results were obtained "in a clinical setting." Compl. ¶ 140.

10   No CW claims to have knowledge of the clinical observations and Plaintiff does not allege the

11   summary of the clinical observations (restated in Statement 7) were objectively false. Mot. at 8;

12   *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015) ("Courts have

13   repeatedly held 'publicly stated interpretations of the results of various clinical studies' to be

14   'opinions' because '[r]easonable persons may disagree over how to analyze data and interpret

15   results, and neither lends itself to objective conclusions.'" (citations omitted) (alteration in

16   original)). Plaintiff neither connect how the experiences of physicians in practice bears on the

17   truth of these clinical results nor alleges the results themselves are false. The cases Plaintiff cites

18   are equally unhelpful. *See Robb v. Fitbit*, 216 F. Supp. 3d 1017, 1029–30 (N.D. Cal. 2016)

19   (holding statements about clinical research actionable because Plaintiff identified "numerous

20   statements," outside the Prospectus, that were false and showed the clinical results were false);

21   *3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 4759021 (S.D. Cal. Oct. 20, 2017) (opinion

22   does not refer to clinical statements). Moreover, Plaintiff does not allege that the ARTAS System

23   could *not* be programmed to dissect as many grafts as possible or that it could not be programmed

24   to dissect grafts with more than two hairs. *Cf.* Opp. (failing to discuss Defendants' rebuttal to this

25   effect).

26   For these reasons, the Court holds that Plaintiffs failed to plead falsity for Statement 8.

27   Case No.: 5:18-cv-03712-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
28   DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

Accordingly, this Court **GRANTS** Defendants' motion to dismiss as to this claim.

**Statement 9.[11]**  Plaintiff alleges the statement "representing an aggregate installed base growth of approximately 34% from December 31, 2015, or 174 to 233 systems" is materially false, misleading, and incomplete because "a significant portion of ARTAS Systems purportedly 'sold' internationally had not yet been installed."  Compl. ¶¶ 144–45.  This misrepresented the number of "installed" versus simply "sold" ARTAS Systems (this is important because it affects procedure-based [as opposed to systems] revenue).  Opp. at 10–11.

Defendant argues this fails because Restoration clearly disclosed: (1) how it derived "installed base" figures (by reference to unit sales); (2) that "sales" were not translating proportionally to procedure-based revenue, and (3) why sales might not translate proportionally to procedure-based revenue.  Reply at 2.  First, this Court cannot infer from the Prospectus that the phrase "installed base" excludes foreign sales; to the contrary, the Prospectus lumps all sales together without clarifying if "growth of approximately 34%" includes or excludes foreign sales.  Masuda Decl., Ex. A at 65; Opp. at 12 ("[N]owhere in the Prospectus do Defendants disclose that sales to distributors were subject to prolonged periods of warehousing and that doctors were not actually purchasing the ARTAS Systems.").  Second, Defendants' explanations for why procedure-based revenue was declining is inappropriate at this stage—the question is not *why* the revenue was declining, but whether Plaintiff pled adequate facts plausibly indicating that Defendants mislead investors as to the rate of "installed" ARTAS Systems.  *See* Opp. at 13 n.12; *see also Iqbal*, 556 U.S. at 1948–51 (noting that when there are well pleaded factual allegations, the court should assume their veracity and determine if they plausibly give rise to an entitlement to relief).

If, as Plaintiff contends, Defendants were selling to international resellers, the sales would not automatically convert into procedure-based revenue.  *See* Compl. ¶ 157 (international sales

[11] Because this Court does not address Defendants' Madrid argument, the Court does not address Plaintiff's submission of a Recent Decision.  *See* Dkt. 61.

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

United States District Court
Northern District of California

resulted in distributors purchasing and holding product, while American sales resulted in installation of the system). These facts, taken as true, are sufficient under Rule 8(a)(2) to show "these systems remained uninstalled and unproductive," rendering the "installed based" a half-truth. *See* Opp. at 12 n.10. A reasonable person, drawing all factual inferences in Plaintiff's favor, could conclude the "34% growth" included foreign sales. Thus, Plaintiff has pled sufficient facts showing a plausible claim that this is a materially misleading misstatement.

For these reasons, the Court holds that Plaintiff pled falsity for Statement 9. Accordingly, this Court **DENIES** Defendants' motion to dismiss as to this claim.

**Statement 10.** Defendants stated they "believe revenue from procedure based fees [had] not grown proportionally with the increase in [the] *installed base*" because of "limited or no utilization of the ARTAS System after purchase as a result of a change in physician preference or practice." Compl. ¶ 146. Plaintiff alleges this was materially misleading because it misstates and omits the "fact" that: "(i) the Offering Materials misrepresented the '*installed base*' as all units sold, despite the fact that numerous units were being warehoused by third-party distributors and were not installed or in use, and thus unable to contribute to procedure revenue; and (ii) the "limited or no utilization" of the ARTAS System after purchase was . . . caused by the Company's failure to provide adequate marketing support, product defects with needles in the kits, and software glitches." *Id.* ¶ 147. The Court has already concluded the "ineffectiveness" of the marketing effort, see *supra* IV.A.2.i, and the system issues/glitches, see *supra* IV.A.2.ii, are not actionable.

Plaintiff has not pled why "installed-base" in this context is actionable. Read in context, Defendants were explicit that they could not predict success and, in fact, predicted loss of funds. Masuda Decl., Ex. A at 50; *see also In re IAC*, 695 F. Supp. 2d at 117(noting that statements in a prospectus must "be read in the context of the whole document"). Further, Defendants repeatedly informed investors that sales to international distributors did not result in "installation." *See* Masuda Decl., Ex A at 18 (describing distributors that sell ARTAS Systems to international users

and the international sales process generally).  Investors, thus, knew installed base did not per se include international sales in this context and so, unlike Statement 9, there is no confusion of whether *sales* and *installed base* were synonymous.

Moreover, Restoration merely opined on reasons why procedure-based fees were not tracking unit sales—Statement 10 did not provide limited reasons for the decline.  *Cf.* Compl. ¶ 146 ("[D]ue to a number of factors, including . . . .").  Plaintiff implies the disparity was solely due to warehousing, but this is directly contrary to their other claims.  *See* Reply at 4 (discussing Opp. at 12–13); Compl. ¶ 147 (listing several reasons for the decline).  The statement does not exclude the possibility that warehousing had something to do with the decline; it only lists "factors" contributing to the decline.  Thus, it is possible warehousing and needle corruption did contribute to the decline.  Defendants make no claim that the decline in stock price was due purely to limited use of the ARTAS Systems (both in the statement itself and contextually).  Therefore, Plaintiffs have not pled that Statement 10 is false or materially misleading.

For these reasons, the Court holds that Plaintiff failed to plead falsity for Statement 10. Accordingly, this Court **GRANTS** Defendants' motion to dismiss as to this claim.

### B.  Section 15 Claim

Plaintiff has stated a claim for an underlying violation of Section 11 and thus has stated a claim for a violation of Section 15.  *Primo v. Pac Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1130–31 (N.D. Cal. 2013).

### C.  Item 303 Claim

Item 303 requires the Offering Materials to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §§ 229.303(a)(3)(ii).  A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is *both* [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing,*

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

25

*Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). The Ninth Circuit has held that because Section 11 imposes liability if a registrant "omits to state a material fact required to be stated" in the registration statement, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11." *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (quoting *Steckman*, 143 F.3d at 1296).

Defendants argue that "Item 303 is not actionable . . . under Section 11," because recently, in *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055–56 (9th Cir. 2014), the Ninth Circuit held that Item 303 "does not create a duty to disclose for the purposes of Section 10(b) and Rule 10b-5." Mot. at 20. Defendants contend that because the test for whether a statement is materially misleading is "identical" for both Section 10(b) and Section 11 claims, *In re NVIDIA* applies to Section 11 cases as well. Reply at 10. While it is true the Ninth Circuit has stated Section 10(b) and Section 11 claims share the materiality element, *City of Dearborn Heights*, 856 F.3d at 616, the *NVIDIA* Court was explicit in noting that *Steckman* was still good law. *See In re NVIDIA*, 768 F.3d at 1055–56 ("To put it differently, liability arises from 'an omission in contravention of an affirmative legal disclosure obligation.' There is no such requirement under Section 10(b) or Rule 10b-5." (citation omitted)). Thus, Plaintiff may bring an Item 303 claim.

Plaintiff must establish that Defendants "failed to disclose known trends and uncertainties." 17 C.F.R. §§ 229.303(a)(3)(ii). Plaintiff argues Defendants failed to establish three trends: the trend related to warehousing by Foreign Defendants, the trend of Restoration's customers abandoning use of ARTAS, and the trend of uncertainty related to physicians stalling purchases.

### 1. Trend Related to Warehousing

Plaintiff argues that leading up to the IPO, distributors overseas began to bulk purchase ARTAS Systems and "warehouse" them. Opp. at 19. This resulted in a trend of the foreign markets becoming saturated, causing system sales to decline abroad and resulting in Restoration pivoting to a U.S. centric model of business. *Id.*

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

The Complaint alleges only one specific instance of purported "warehousing." "CW 1 specifically recalls [warehousing] occurring with a distributor in Madrid, Spain, but stated the practice was common." Conclusory allegations like "the practice was common" must be disregarded. *See Iqbal*, 556 U.S. at 1948–51; *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, *8 (S.D.N.Y. Mar. 29, 2016) (holding single allegation of "de-stocking" activity *prior* to IPO was insufficient as a matter of law to support plausible inference that, at the time of the IPO, products "were being destocked in such a material way as to require disclosure"). Thus, Plaintiff presents *only one* instance of warehousing. Reply at 11. A trend under Item 303 requires an "observed pattern that accurately reflects persistent conditions of the particular registrant's business environment." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002). Here, "nothing in the [Complaint] creates a plausible inference that this was a trend rather than an isolated event" because only *one* instance of "warehousing" is alleged. *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010).

To combat this, Plaintiff points to post-IPO statements and actions to show a trend of warehousing. *See* Opp. at 19. These events, however, took place seven-months *after* the IPO. *See In re Coty*, 2016 WL 1271065, at *9 ("Plaintiffs' one-two punch of poor *post-IPO* earnings coupled with temporally nonspecific and substantively vague assertions of destocking by one confidential informant is not enough to establish the falsity of the Registration Statement or the existence of an omitted known trend." (emphasis added); *In re CPI Card Group Inc. Securities Litigation*. 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) (finding actionable trend when over-saturation was done *before* the IPO). *Id.* This is insufficient.

Finally, Plaintiff's Complaint does not demonstrate that a material impact from any such warehousing trend was "reasonably likely to occur" at the time of the IPO. *Compare* Compl. ¶ 145 (alleging only that ARTAS Systems were being warehoused), *with Fresno Cty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694, 695 (9th Cir. 2015) (holding no trend alleged because complaint did not specify what portion of inventory was defective or how it affected

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

27

revenue projections).  Accordingly, no trend related to warehousing is shown.

**2.  Trend of Abandoning Use of ARTAS**

Plaintiff next argues that Defendants failed to disclose physician's widespread discontent with the ARTAS System due to lack of patient leads, effective marketing support, and needle defects.  Opp. at 20.  This caused physicians to abandon the ARTAS System, which widened the disproportionate relationship between systems and procedure-based revenues.  Compl. ¶ 85. Plaintiff argues this trend of customer dissatisfaction and non-use of the machine is "precisely the type of information an investor would attach importance in making an investment decision."  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 722 (2d Cir. 2011).  The issue, however, is not whether an investor would want to know of such discontent, but whether, at the time of the statement, such a knowable trend existed.

Unlike in the Section 11 claims discussed above, Plaintiff must establish knowledge on the part of Defendants regarding any alleged trend of abandonment.  In the Complaint, Plaintiff does not state (or allow the Court to infer) that Defendants *knew* of any of these problems.  To the contrary, Plaintiff alleges Defendants did not know of problems pertaining to marketing strategy, product defects, or patient lead issues.  *See* Compl. ¶ 107 ("[Defendants] attended these meetings. Rather than re-evaluate the Company's sales strategy *or address the lead and product issues at these weekly meetings . . . .*"); *In re Coty*, 2016 WL 1271065, at *7 ("Instead, Plaintiffs merely allege that there were meetings and describe only in broad, conclusory terms what was discussed at those meetings. . . . As a result, Plaintiffs' allegations are '[s]ketchy at best' and 'do not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible.'").

Finally, the Court finds Plaintiff's use of *Panther Partners Inc. v. Ikanos Communications, Inc.* unpersuasive.  681 F.3d 114 (2d Cir. 2012).  There, the court concluded the defendant failed to fully disclose the significance of a known chip defect because it "knew at the time it was receiving an increasing number of calls . . . it would be unable to determine which chip sets contained defective chips [despite indicating otherwise]."  *Id.* at 121.  In contrast, here, Defendants

were forthright about the limited commercial success of the ARTAS System: "We have limited commercial history and we have incurred significant losses since our inception. We anticipate that we will continue to incur losses for the foreseeable future . . . . Our operating expenses may fluctuate significantly." Masuda Decl., Ex. A at 12–13. Investors were *explicitly* warned of a downward trend of ARTAS Systems. Thus, unlike Plaintiff's assertion that Defendants were "touting the health and management" of Restoration, the opposite is shown. Opp. at 20. Therefore, the Court does not find a trend shown.

### 3. Trend and Uncertainty Related to Physicians Stalling Purchases

Finally, Plaintiff alleges that there was a known trend of physicians stalling purchases of the ARTAS System at the time of the IPO. Compl. ¶¶ 112–15. Restoration was developing a new robotic implantation feature that had not received FDA approval. *Id.* ¶ 114 (information about new system was in Prospectus). It was supposed to receive approval in late 2017. *Id.* However, in the interim, Defendant Rhodes instructed members not to mention the forthcoming feature to customers so that it would not cause any more of a decline or delay in sales. *Id.* ¶¶ 116–17. Defendants first discussed this in a May 2018 conference call and indicated customers were hesitant to buy the ARTAS System because of the impending new system. *Id.* ¶ 167. Plaintiff argues this hesitancy was shown by the negative unit-sales at the time of the IPO. Opp. at 22.

Contrary to Plaintiff's assertion, sales were actually increasing in the months prior to the IPO. Masuda Decl., Ex. A at 65. Plaintiff does not allege these figures were false. Further, CW 3 does not allege *when* Defendant Rhodes instructed employees to avoid mention of the forthcoming implantation feature, but only alleges that in 2018, seven months after the IPO, the effect of the new technology was discussed. *See* Compl. ¶¶ 117, 167; *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1127 n.8 (C.D. Cal. 2012) ("Plaintiffs' citation to Defendants' subsequent disclosure, on August 5, 2010, that there was a six-week delay in loading Scient'x's products into Alphatec and vice versa . . . is insufficient by itself to show that those delays were either known or could reasonably be expected to have a material impact [on Prospectus Publication Date].");

*Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) ("Fraud by hindsight is not actionable." (citation and quotation marks omitted)).  Plaintiff does not allege sufficient facts to show, at the time the Prospectus was published, physicians were stalling purchases *or* that Defendants knew of this trend.  Thus, the Court does not find a trend here either.

Accordingly, Plaintiff has not pled sufficient facts to show an Item 303 violation and thus Defendants' motion to dismiss is **GRANTED** as to Item 303.

## V.  LEAVE TO AMEND

When dismissing a complaint for failure to state a claim (either in full or in part), a court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000).  The Court has determined that Plaintiffs fail to state a claim for Statements 1–6, 8, and 10.  Because, however, Plaintiffs may salvage their Complaint, the Court finds amendment would not be futile for all but Statement 6.  Plaintiffs' claims are therefore dismissed with leave to amend.

## VI.  CONCLUSION

Defendants' motion to dismiss Plaintiffs' Complaint is **GRANTED** in part and **DENIED** in part.  Plaintiff has leave to amend.  Should Plaintiffs choose to file an amended complaint, they must do so by November 14, 2019.  Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of the dismissed claims with prejudice.  Plaintiffs may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: October 18, 2019

EDWARD J. DAVILA
United States District Judge

Case No.: 5:18-cv-03712-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS; GRANTING DEFENDANTS' JOINDER MOTIONS

30